IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Chyrianne H. Jones,                :

       Plaintiff,              :

     v.                           :    Case No. 2:08-cv-1047

St. Jude Medical S.C., Inc.,       :    JUDGE GEORGE C. SMITH
et al.,                                 Magistrate Judge Kemp
                                   :
      Defendants.

OPINION AND ORDER

     This employment discrimination case is before the Court to
resolve two related motions: plaintiff Chyrianne H. Jones' motion
to compel discovery, and her motion for an extension of time to
respond to the pending summary judgment motion.  Both motions are
fully briefed.  For the following reasons, the motion to compel
will be granted in part and denied in part, and a date will be
set for responding to the summary judgment motion.

I.  Background

    In order to place the current motions into context, it is
helpful to recite briefly the background of the parties' dispute
and also the defenses raised by defendants (to whom the Court
will refer collectively as "St. Jude") in their summary judgment
motion.

    The following facts appear not to be disputed.  Ms. Jones
worked for St. Jude, prior to her termination in 2009, as a sales
representative.  She sold pacemakers and internal defibrillators
to doctors and hospitals.  Before 2007, she had worked for St.
Jude in Jacksonville, Florida selling similar devices.  She moved
to Columbus in 2007 for personal reasons.

    Right before Ms. Jones began working in Columbus, St. Jude
had purchased the business of a medical device distributor, Ohio

Pacesetters, through which it had been distributing its devices. When it took over the business directly, it assigned its sales representatives, including Ms. Jones, to various existing accounts. Her main account was Riverside Methodist Hospital.

The parties appear to dispute how well Ms. Jones performed in that account. For purposes of the two pending motions, it suffices to say that after St. Jude shifted some accounts around in 2008, Ms. Jones was no longer responsible for the Riverside account. In 2009, St. Jude claims that it underwent a nationwide reduction in force. Ms. Jones was selected for termination and was offered either a severance package or continued employment under a performance improvement plan. She chose the latter option. According to St. Jude, her performance never met the goals set for her, and it also discovered that she had secretly been tape-recording telephone conversations with customers and with St. Jude's employees or managers. It claims to have terminated her for those reasons. She asserts that St. Jude engaged in a pattern of discrimination and retaliation against her while she was still employed, and that she was terminated for the same impermissible reasons (i.e. considerations of sex and race).

## II. <u>The Motion to Compel</u>

When it was filed, the motion to compel discovery addressed a fairly broad variety of unproduced documents. They included a portion of the employment file of Lewis Antol, another St. Jude sales representative; a tape recording of a conversation between Ms. Jones and defendant Michael Moore; St. Jude's nationwide ranking of its sales managers; documents relating to two other St. Jude employees, Jerry Hudson and Kevin Beale; certain documents prepared by a former St. Jude employee, Lou Major; 2006 sales data for the Riverside Hospital account; and notes made by St. Jude's in-house counsel, Robert Dunn, after he received a

-2-

letter from Ms. Jones' counsel on March 5, 2008.  According to
the motion to compel, many of these documents fell into the
category of "promised but not yet produced," although in some
cases St. Jude had advised Ms. Jones that the documents did not
exist, were too burdensome to produce, or were protected by the
work product doctrine.

In determining what issues are still in dispute, the Court
now has the benefit not only of the remainder of the briefs filed
regarding the motion to compel, but the memoranda which the
parties filed in support of and in opposition to Ms. Jones'
motion for an extension of time to respond to defendants' summary
judgment motion.  From those filings, the Court concludes that
the dispute has been significantly narrowed.

First, it is undisputed that St. Jude produced additional
documents after the motion to compel was filed.  In her reply
brief, Ms. Jones does not discuss further the documents relating
to Mr. Antol, Mr. Hudson or Mr. Beale.  Consequently, as of the
date that memorandum was filed (January 13, 2011), those matters
appear to have been resolved.

Second, in defendants' memorandum in opposition to the
motion for an extension of time, St. Jude represents that it
produced more documents after receiving the reply brief on the
motion to compel.  They included the tape recording and
additional documents from Mr. Major.  Further, St. Jude stated
that the "raw sales data" for Riverside had already been
produced, so that there should be no issue about that
information.  It suggested that the only outstanding issue was
Mr. Dunn's notes, and, reiterating its position that those notes
are covered by the work product doctrine, argued that no
extension of time was needed because the Court would not be
ordering any more documents to be produced.

Ms. Jones filed her reply memorandum on that motion on

-3-

January 31, 2011.  In it, she disputes that she has been given
the raw sales data for 2006 that she asked for.  She also asserts
that although she now has the documents prepared by Mr. Major,
she has not been provided with any documents (particularly
emails) showing that Mr. Moore received or had knowledge of these
documents.  Finally, she re-argues her position that Mr. Dunn's
notes are not work product because his work was all done as part
of a human resources investigation and that he was not
functioning as an attorney when he participated in that
investigation.

III.  <u>Sales Data and Major Documents</u>

The Court will dispose of the issues concerning the 2006
sales data and Mr. Major's documents first because there do not
appear to be any legal disagreements about them which require
resolution.  Rather, if anything, they involve some level of
factual disagreement about what has been produced.

It is not entirely clear to the Court that the parties have
engaged in any effort to resolve extrajudicially any issue about
documents showing that Mr. Moore received or otherwise had
knowledge of the business analyses prepared by Mr. Major.  The
focus of Ms. Jones' briefing up to the point of her reply
memorandum on the motion for an extension was on the documents
themselves.  However, she does make a valid argument about the
relevance of documents which might show that Mr. Moore knew about
them.  The Court assumes that defendants have no objection to
producing any documents which might show whether, and when, Mr.
Moore received these analyses.  Consequently, if such documents
have not been produced, defendants should be able to produce them
within fourteen days.

The arguments about the sales data do not appear to be
particularly responsive to each other.  St. Jude has now
represented that it has produced all of the relevant data both in

compilation form and in its native state, and that it has nothing
else to produce.  It specifically points to information contained
in its July 10, 2010 production on this issue, asserting that the
raw data can be found behind the third tab of the spreadsheet,
which is labeled "data."  In her response to this memorandum, Ms.
Jones does not address this argument directly, or explain why
whatever information appears behind that tab is insufficient;
rather, she simply repeats her argument that the raw data from
which the compilation was made must exist somewhere, and that
defendants have yet to produce an affidavit indicating why it
would be overly burdensome to retrieve it.

The state of the record makes it difficult for the Court to
resolve this issue.  The Court will, however, credit St. Jude's
assertion that it has produced all of the underlying data, with
the caveat that this matter may still require some conversation
among counsel to insure that Ms. Jones' counsel understand
exactly what has been produced and the basis of St. Jude's
assertion that there is no additional information, in any format,
that is responsive.  If such additional conversations do not
persuade Ms. Jones' counsel that everything which was requested
has now been produced, and if counsel cannot resolve any further
questions which arise, they shall request a conference with the
Court on this issue.  Otherwise, the Court will assume there is
no longer a dispute about this data and that, on this subject,
Ms. Jones has what she needs to be able to make her responsive
argument to the summary judgment motion.

### IV.  The Dunn Documents

The only dispute that involves a legal determination (in
addition to a factual determination) surrounds the documents
(which seem to be limited to notes) prepared by St. Jude's in-
house counsel, Robert Dunn, as part of St. Jude's 2008
investigation of Ms. Jones' claim of discrimination or

retaliation.  St. Jude acknowledges that Mr. Dunn did an investigation of those claims, and that Ronald J. Spielberger, Vice President and General Counsel, wrote a letter to Ms. Jones' counsel, Judith E. Galeano, on May 16, 2008, stating that St. Jude had "fully investigated" her complaints and that it found "no ... violation of State and Federal Anti-discrimination."  See Plaintiff Chyrianne H. Jones' Reply to Defendants' Memorandum in Opposition to Plaintiff's Motion for an Extension of Time to Respond to Defendants' Motion for Summary Judgment, Doc. No. 75, Exhibit 2.  That letter was written in direct response to a letter from Ms. Galeano dated May 7, 2008.  However, two months earlier, Ms. Galeano wrote a letter to two St. Jude human resources employees, Paul Woodstock and Laurie Valle, concerning the removal of Ms. Jones from the Riverside Hospital Account. The letter suggested that this action was both a breach of Ms. Jones' employment agreement and was taken for discriminatory reasons.  Ms. Galeano asked that the letter be forwarded to counsel and that she be contacted within five days.  See Defendants St. Jude Medical, S.C., Inc. and Michael Moore's Response in Opposition to Plaintiff's Motion to Compel, Doc. No. 52, Exhibit B.  St. Jude argues that, at least for the time period between the March 5, 2008 letter and the May 16, 2008 response, Mr. Dunn conducted an investigation of Ms. Jones' claims which was separate from any human resources investigation and which was done for the purpose of evaluating St. Jude's legal position.  Thus, it argues that any notes of this investigation need not be produced because they represent protected work product.

The work product doctrine is now derived from Fed. R. Civ. P. 26(b)(3).  That rule exempts from discovery documents and tangible things which would otherwise be discoverable if they have been "prepared in anticipation of litigation or for trial by

or for another party or by or for that other party's
representative (including the other party's attorney, consultant,
surety, indemnitor, insurer, or agent)...."  The limitations on
discovery of work product can be overcome, however, "upon a
showing that the party seeking discovery has substantial need of
the materials in the preparation of the party's case and that the
party is unable without undue hardship to obtain the substantial
equivalent of materials by other means."  Even if the court does
direct that trial preparation materials be disclosed, the court
is required to "protect against disclosure of the mental
impressions, conclusions, opinions, or legal theories of a
party's attorney or other representative concerning the
litigation."

In determining whether the work product doctrine applies,
the party seeking discovery has the initial burden of showing
that the documents in question are "otherwise discoverable,"
that is, that they are both relevant to the action and
not subject to any other claim of privilege.  Once that
burden has been met, the party opposing discovery must
demonstrate that the documents were "prepared in
anticipation of litigation or for trial...."  Nothing else is
necessary in order to support a claim that Rule 26(b)(3) is
applicable.  See generally Toledo Edison Co. v. G. A.
Technologies, Inc., 847 F.2d 335 (6th Cir. 1988).

The legal issue which separates the parties as to whether
Mr. Dunn's notes are work product is whether these notes were
created "in anticipation of litigation."  Ms. Jones did not file
a charge of discrimination with the EEOC until June of 2008, and
did not file her complaint in this case until November 6, 2008.
Consequently, one of her arguments is that because litigation
could not reasonably have been anticipated when Mr. Dunn took
these notes, they cannot be work product.  Her other argument is
that, at least for a portion of the time when Mr. Dunn was
conducting his investigation, a human resources employee, Ms.

-7-

Lapore, was also conducting an investigation which did not result in the production of any work product, and that because she and Mr. Dunn interviewed some of the subjects of the investigation together, he cannot claim work product for his notes of these interviews - and particularly for any investigation which post-dated May 16, 2008, the date on which Ms. Jones' counsel was told that an investigation (presumably Mr. Dunn's, because Ms. Lapore did not start her investigation until June 3, 2008) had been completed.  St. Jude apparently concedes that these two investigations overlapped to some extent, but argues that because they were being conducted for different purposes (one for human resources reasons, and one for legal reasons) the overlap is irrelevant to the question of whether Mr. Dunn's notes constitute work product.

The first issue raised by Ms. Jones' memoranda is whether St. Jude could reasonably have anticipated litigation after receiving the March 5, 2008 letter from Ms. Galeano.  Ms. Jones asserts that this letter contained no threat of suit and that it can be "ignored" for purposes of the work product analysis.  She relies on decisions from the Courts of Appeals for the Third and Eighth Circuits, Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124 (3d Cir. 2000) and Diversified Industries, Inc. v. Meredith, 572 F.2d 596 (8th Cir. 1977) in support of this argument.

Diversified, the earlier decision, involved an investigation into corporate practices which had been commissioned by the corporation's board of directors after it had been discovered, in the context of some proxy-related litigation, that the corporation may have created a slush fund to be used for unlawful purposes.  A law firm was retained to conduct this investigation. It was not retained to represent the corporation in any particular litigation, and it prepared both a preliminary report

-8-

outlining how it intended to conduct the investigation, and a
more thorough report after it had completed its work.  The court
held that the earlier memorandum was not protected by either the
work product doctrine or the attorney-client privilege, and that
in order for the work product doctrine to apply, the threat of
litigation had to be more than a "remote prospect of future
litigation" and not simply a suspicion that, because of the
corporations' conduct, "litigation of some sort in the future"
might occur.  Id. at 604.  Obviously, however, this decision is
of limited assistance in evaluating St. Jude's claim that its
investigation, which was undertaken after it received a specific
letter from an attorney making specific claims of unlawful
conduct, might constitute work product, because nothing of the
sort occurred in the Diversified case.

Holmes involved a fact situation more similar to the one
presented here.  There, an individual who sought interest on a
claim for benefits due under an ERISA plan sought those benefits
first from the plan, through administrative channels, before he
filed suit.  The plan's attorney prepared a memorandum analyzing
the claim for interest, which was then sought during discovery
after the claim ripened into litigation.  A magistrate judge had
concluded that the memorandum was protected work product, but the
Court of Appeals disagreed, holding that the fact that the
memorandum was prepared shortly after the plan's attorney
received a telephone call from an attorney representing the
claimant was not, by itself, enough to prove that the memorandum
was written specifically because there was a prospect of
litigation.  Rather, there was simply insufficient evidence in
the record to satisfy the plan's burden of showing that the
threat of litigation, and not some business reason, motivated the
preparation of the memorandum.

Certainly, a letter from an attorney representing an

employee of a corporation suggesting that the corporation has
discriminated against that employee or breached her contract may
spur a business-related investigation into such allegations.  It
may also, however, lead the recipient to believe that the
employee intends to litigate such issues to the extent that they
cannot be resolved through the ordinary course of business
decision-making.  The question then becomes whether, under the
test as articulated in this circuit, the March 5, 2008 letter
created the type of anticipation of litigation necessary to
justify denying Ms. Jones access to Mr. Dunn's notes on work
product grounds.

The Court of Appeals discussed the parameters of this issue
in <u>United States v. Roxworthy</u>, 457 F.3d 590 (6th Cir. 2006).  It
noted that various tests for when a party has an objectively
reasonable anticipation of litigation could be found in decisions
from other courts, and focused particularly on the question of
when an IRS audit would lead a corporation to believe that it
might be sued.  The court concluded that, under the facts of that
case, such a fear of litigation was reasonable under any test,
because the likelihood that the IRS would challenge the
transaction disclosed by its tax audit was "concrete" given the
fact that the transaction was large, the IRS had challenged
similar transactions in the past, and it was possible to identify
the specific claims and specific transactions which would be at
issue in that litigation.  <u>See id</u>. at 600.

Courts interpreting <u>Roxworthy</u> have recognized that it did
not definitively adopt a test on this question, but those courts
have also concluded that <u>Roxworthy</u> reinforces the notion that the
party claiming work product protection has the burden of showing
both the existence of a subjective fear of litigation and the
objective reasonableness of that fear, and the burden of coming
forward with some admissible evidence that, in fact, the

anticipation of litigation was the motivating factor behind the
preparation of the documents.  See Gruenbaum v. Werner
Enterprises, Inc., 270 F.R.D. 298 (S.D. Ohio 2010); Goldfaden v.
Wyeth Laboratories, Inc., 2009 WL 2602437 (E.D. Mich. August 21,
2009).  The needed evidence may be presented "in any of the
traditional ways in which proof is produced in pretrial
proceedings such as affidavits made on personal knowledge,
depositions, or answers to interrogatories ...." Goldfaden, 2009
WL 2602437, *2.

Here, the Court's analysis is hampered somewhat by the fact
that, as far as the Court can tell, St. Jude has not submitted an
affidavit from Mr. Dunn explaining why he conducted an
investigation or made the notes in question.  However, the
absence of such proof is not the basis on which Ms. Jones claims
that these notes are not work product.  Consequently, the Court
will, as Ms. Jones has done, focus on the question of whether St.
Jude could have developed an objectively reasonable belief that
it might be called upon in the future to litigate the issues
involved in this case when it received Ms. Galeano's March 5,
2008 letter.

Ms. Galeano's letter begins by stating that Ms. Jones had
retained legal counsel to represent her concerning "adverse
employment actions ....."  It identifies one action in particular
- the removal of the Riverside Hospital account - as being
problematic, and it also identifies two separate legal claims
which might be asserted out of that action, namely breach of
contract and employment discrimination.  It also states that, in
Ms. Galeano's legal opinion based on her review of information
received from her client, St. Jude's actions were "unwarranted."
It concluded with a request that the matter be handled in the
future on an attorney-to-attorney level.

Any investigation of these matters following receipt of this

-11-

letter would not be, as was the case in <u>Diversified</u>, simply an
effort by St. Jude to find out about a potentially problematic
corporate practice which did not involve a specific claim
presented by a specific potential plaintiff.  Further, this
strikes the Court as materially different from the situation in
<u>Holmes</u>, where it was entirely appropriate for the claimant, in
the ordinary course of business, to present an interest claim to
his own ERISA plan in an effort to receive payment in the
ordinary course of business.  Here, the letter in question does
not involve routine business matters such as whether Ms. Jones
was entitled to some additional compensation for work performed,
but involves matters which are customary fodder for employment-
related litigation.  The request that any response come from St.
Jude's attorneys only highlights the fact that Ms. Jones intended
to communicate the fact that the matter had progressed beyond the
point where she believed that it could be handled in the routine
course of business.  Even if that were not her intention, a
reasonable person could well have concluded that it was.  Thus,
as was the case in <u>Roxworthy</u>, immediately after receiving the
letter, St. Jude would have been able to identify with "concrete
specificity" the claims and transactions which would be involved
in any future litigation with Ms. Jones.  Although there is
nothing to suggest that Ms. Jones (unlike the IRS) had a custom
or practice of litigating such issues, employees who believe that
they have been victimized by workplace discrimination often do
litigate, and the magnitude of the grievance here, involving a
well-compensated employee and a major account, made that prospect
more likely.  Under all of these circumstances, the Court rejects
Ms. Jones' argument that St. Jude could not reasonably have
anticipated litigation after receiving the March 5, 2008 letter.

The other issue Ms. Jones raises, which appears to relate
only to any investigation done by Mr. Dunn after May 16, 2008, is

-12-

that because the "legal department" investigation of Ms. Jones'
claims had been completed by that date, any further actions he
took could not have been performed in anticipation of litigation.
She cites to deposition testimony which indicates, for example,
that he sat in on an interview of Fred Suppes, another St. Jude
employee, who was accused of making a racially-inappropriate
comment and whose employment with St. Jude was ultimately
terminated, and argues that he could not have been acting as St.
Jude's attorney or preparing for litigation with Ms. Jones.  She
emphasizes that Mr. Dunn did not tell Mr. Suppes that when he
appeared along with Ms. Lapore for the interview, he was doing so
in his capacity as a legal advisor to the company.

The Court has little difficulty dealing with the
propositions that an attorney, in order to be acting in
anticipation of litigation, must disclose that fact to each
person he or she interviews.  That is simply not an element of
the work product doctrine.  Further, the mere fact that St. Jude
sent Ms. Galeano a letter on May 16, 2008 stating that it had
completed an investigation and found no basis for liability does
not necessarily mean that it thought, or reasonably should have
thought, that she would be satisfied with the response and that
litigation had been avoided.  It is not uncommon that unhappy
employees are not pacified by letters which completely reject
their claims and that, after receiving such letters, they choose
to sue.  Certainly, one might reasonably expect that response.

What is more troubling, however, is the fact that Mr. Dunn
apparently did not conduct a completely independent investigation
after May 16, 2008, but, particularly in the case of Mr. Suppes,
accompanied a human resources representative while she was doing
an "administrative investigation" of one of the items mentioned
in Ms. Galeano's May 7, 2008 letter involving Mr. Suppes.  Unlike
the allegations made in the earlier letter, all of which can

reasonably be seen as dealing only with Ms. Jones' specific situation and her potential claims, the allegation involving Mr. Suppes which Mr. Dunn and Ms. Lapore subsequently investigated did not directly involve Ms. Jones (the alleged comment was directed toward Mr. Major), and the apparent reason for the investigation was not to address any legal claim of Ms. Jones', but to determine whether Mr. Suppes made the comment and whether he should be disciplined for it. There is nothing in the record to suggest that St. Jude was anticipating legal action either from Mr. Major or Mr. Suppes when this interview was conducted or that this threat of litigation was the reason why Mr. Dunn was at the interview. Further, St. Jude has apparently turned over Ms. Lapore's notes of this same interview.

The parties have not cited any cases dealing with the precise question of whether a single interview of a single witness, attended by both a non-legal employee and a legal advisor, and purportedly conducted for both business reasons and in anticipation of litigation, can be parsed to the point where the notes of the non-legal employee are legitimately subject to discovery, while the notes of the legal advisor are not. The Court's research has also not uncovered any case law on this exact issue. It is certainly the case that a non-lawyer may be called upon by a lawyer to assist in the creation of work product, so that the participation of non-lawyers in the work product process is not necessarily inconsistent with the assertion of a work product claim. See, e.g., IBJ Whitehall Bank & Trust Co. v. Cory & Associates, Inc., 1999 WL 617842, *6 (N.D. Ill. August 12, 1999), citing Allendale Mut. Ins. Co. v. Bull Data Sys., 152 F.R.D. 132, 136 (N.D. Ill. 1993). However, that precept does not cover this situation because St. Jude concedes that Ms. Lapore was at the interview for reasons unrelated to the potential for litigation from Ms. Jones, and it has not asserted

-14-

work product protection for her notes.

The Court leaves open the possibility that, in the proper circumstances, investigations protected by the work product doctrine and other types of investigations may proceed simultaneously and may even involve joint interviews of the same witnesses.  However, especially given the fact that on this aspect of work product, like any other, the party asserting protection must meet its burden of proof through the production of some evidence, the Court finds that such unusual circumstances are not present here.  Again, there is no affidavit from Mr. Dunn indicating why he participated in the interview of Mr. Suppes, so there is little, if any, proof on the subjective prong of the work product test.  And, as far as the objective prong is concerned, there is no evidence (at least in the record the parties cite in their memoranda on this issue) that, after the May 16, 2008 letter was written, St. Jude received some new communication focusing on Mr. Suppes' comment that made it likely that its further investigation of that issue was related directly to that comment's relevance to Ms. Jones' threat of litigation. Therefore, the Court does not view the record as supporting a reasonable inference that St. Jude was responding to that threat (or, indeed, the threat of any specific litigation) when it undertook to determine if one of its employees had made a racially offensive comment about someone other than Ms. Jones. Thus, if Mr. Dunn has notes of the interview with Mr. Suppes, they must be produced.  St. Jude may, however, consistent with Rule 26(b)(3)(B), redact from those notes any of Mr. Dunn's "mental impressions, conclusions, or legal theories" concerning the current litigation with Ms. Jones, if any such information is contained in those notes.  That production should occur within fourteen days.

V.  <u>Ms. Jones' Motion for Extension</u>

The disposition of these various discovery issues makes it relatively easy for the Court to resolve Ms. Jones' motion for an extension of time to respond to the pending summary judgment motion.  She is not going to receive much, if any, information as a result of this order which she does not already have.  Further, she has, as a consequence of the motions practice over discovery, already obtained a very substantial extension of time to formulate her response.  The Court believes that, within twenty-one days of the date she receives any additional information about either the 2006 raw sales data or Mr. Dunn's notes, she should be able to file her response.  Given that this additional discovery should be completed within fourteen days of the date of this order, the Court will fix the response date as a date thirty-five days from the issuance of this order.  That date will likely not be extended due to any further disagreements about discovery, but any problems with the implementation of this order shall be brought to the Court's attention as promptly as possible.

### VI.  Disposition and Order

Based on the above discussion, Plaintiff Chyrianne H. Jones' Second Motion to Compel Discovery (#49) is granted in part and denied in part.  Within fourteen days of the date of this order, St. Jude shall produce any documents relating to whether, and when, Mr. Moore learned of the business analyses done by Mr. Major.  Further, within that same time frame, counsel shall confer with each other and resolve, if possible, any issues about St. Jude's production of sales data for the Riverside Methodist Hospital account in 2006, and St. Jude shall produce Mr. Dunn's notes of his interview of Fred Suppes.  The motion is denied in all other respects.  Plaintiff Chyrianne H. Jones' Motion for Extension of Time to Respond to Defendants' Motion for Summary Judgment (#67) is granted.  That response shall be filed no later

than thirty-five days from the date of this order.

                  VII.  <u>Procedure for Reconsideration</u>

     Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5.  The motion must specifically designate the order or part in question and the basis for any objection.  Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

     This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.4.

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge

-17-