## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CHYRIANNE H. JONES,**

      **Plaintiff,**

**v.**

                                    **Case No:  2:08-CV-1047**
                                    **JUDGE SMITH**
                                    **Magistrate Judge Kemp**

**ST. JUDE MEDICAL S.C., INC.,** *et al.*,

      **Defendants.**

### OPINION AND ORDER

Plaintiff Chyrianne H. Jones  ("Plaintiff" or "Ms. Jones") brings this employment action against Defendants St. Jude Medical S.C., Inc. ("St. Jude") and Michael Moore.  Plaintiff alleges that she suffered various adverse employment actions and retaliation in violation of 29 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and Ohio Revised Code § 4112.02, including disparate treatment and hostile work environment discrimination based on race and sex, retaliation for engaging in protected conduct, and wage discrimination.

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 61). Plaintiff has responded and this matter is now ripe for review.  For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## I.    FACTUAL BACKGROUND

Plaintiff Chyrianne H. Jones is an African-American female who was employed with Defendant St. Jude from July 22, 2005 until her termination on December 17, 2009.  Defendant St. Jude is a Minnesota corporation that sells medical devices to both hospitals and physicians.  St. Jude's medical products include cardiac rhythm management ("CRM") devices such as pacemakers and defibrillators, internal cardiac devices ("ICDs"), and biventricular devices ("BiVs").

Plaintiff was hired on July 22, 2005, as a CRM sales representative in Jacksonville, Florida, and she worked there for approximately two years.  (Jones Dep. at 49).  Plaintiff's sales territory in Jacksonville consisted of one high volume physician.  During that two-year period, Plaintiff received acclaim for her outstanding sales performance.  St. Jude designated her as a member of its Circle of Excellence for her outstanding sales and gave her its Rookie of the Year Award in recognition of her sales achievements.  (Valle Dep. at 104; Pl.'s Memo. in Opp. Ex. 1).  Jones' Regional Sales Manager ("RSM") in Florida considered her an excellent sales representative, rating her "4" or, "exceeds expectations," on her 2006 performance appraisal, her last appraisal immediately before her transfer to Ohio.  (Suppes Dep. at 86–87; Pl.'s Memo. in Opp. Ex. 2).

### A.    Establishment of St. Jude's Sales Force in Columbus

Prior to February 2007, St. Jude did not employ a direct CRM sales force in its Columbus, Ohio region.  Instead, it contracted with an independent entity, Ohio Pacesetter Association ("Pacesetter"), to sell and service St. Jude's CRM products in Columbus.  (Moore Dep. at 48).  Effective February 2007, St. Jude bought out its contract with Pacesetter with the intent to replace the independent contractor's sales force with its own direct CRM sales force.  At the time St. Jude terminated the Pacesetter contract, it had not yet hired any direct sales representatives for the region.

2

Consequently, all of St. Jude's sales activities in the region ceased. Louis Major, III, ("Major") a black, African-American male, and the newly designated regional sales manager in Columbus, became solely responsible for servicing all of St. Jude's hospital and individual physician accounts until sales representatives were hired. Major reported directly to Michael Moore, a white male, who was the Area Vice President of Sales for the Columbus region. As an RSM, Major was tasked with identifying and recruiting direct sales representatives for Columbus. (Moore Dep. at 72). Major presented his business plan for the region to Moore; the plan identified the sales representatives, including Plaintiff, whom he intended to hire and the sales territories each would be assigned. (Major Dep. at 52–53).

Despite Major's plan, Moore hired the first three sales representatives for Columbus: Tim Rooney ("Rooney"); Jim McQuarrie ("McQuarrie"); and, Doug Woyton ("Woyton")–all white males. (Major Dep. at 113, 115–18, 127–30). None of these men were included in Major's business plan for the region. Moore also directly negotiated their employment contracts, agreeing to very substantial guarantees[1], commission rates, and very favorable sales territories for each. (Moore Dep. at 80; Major Dep. at 126, 128–32). Typically, a sales representative's guarantee is equivalent to the representative's prior year's earnings as reflected by his W-2s. (Ellen Dep. at 68; Major Dep. at 113; Suppes Dep. at 39).

Major then hired two additional sales representatives, Paul Giacobbe ("Giacobbe") and Plaintiff Jones. (Major Dep. at 137). Major had recommended to Moore that Jones' guarantee be set in an amount equivalent to her W-2s from the preceding year, $320,000. (Major Dep. at 148).

---

[1] A guarantee is a regular rate of pay paid to a sales representative to provide him or her a guaranteed income during a set period while the sales representative is either establishing relationships in the sales territory or serving a non-competition period.

After Moore interviewed Jones, Moore reduced the guarantee offered to Jones from $320,000 down to $210,000.  (Major Dep. at 149).  According to Major, he never heard of a sales representative, whether as intra-company transfer or a new hire, being paid a guarantee less than her prior year's W-2 earnings.  (Major Dep. at 149).  Plaintiff's contract stated: "For the first year of this Agreement (the 'Total Guarantee Period'), Employee [Plaintiff] will receive the greater of the actual compensation (i.e., salary plus commissions) to which Employee would be entitled, or the sum of $210,000.00, whichever is greater, prorated on a monthly basis."  (Jones Dep. Ex. 4). This equates to a monthly minimum compensation guarantee of $17,500.00.  Plaintiff, however, outperformed her contract, so she was not subject to a wage ceiling or salary cap—meaning no limit existed as to what she could have earned.

Unlike most Sales Representatives, Plaintiff's guarantee was paid with no negative repercussions, meaning that if she failed to sell enough implant devices to "justify" her compensation guarantee (i.e., to earn commissions in excess of the guarantee), she was not required to pay back the extra money received at the end of the guarantee period.  (Jones Dep. at 72, Ex. 4, pp. 10-11) ("[I]f at the end of the Total Guarantee Period Employee's earned commissions are short of the guarantee (i.e., a negative balance), SJMSC will forgive the negative balance.").

Plaintiff was assigned a primary territory consisting of four electrophysiologists ("EPs") at Riverside (Territory A in her contract) and a number of smaller, low voltage accounts in outlying areas as well as an additional EP, Dr. Noble (Territory B).  (Major Dep. at 147, 152–54, 165; Pl.'s Memo. in Opp. Ex. 11).

Giacobbe was recruited from a competitor and consequently, he was subject to a one-year non-compete, during which he could not sell in certain Columbus territories, including

4

Riverside—even though that account was assigned to him in his contract. (Suppes Dep. at 99; Moore Dep. at 105; Major Dep. at 134–35). Major set Giacobbe's guarantee based on Giacobbe's prior year's W-2 statements, as was consistent with St. Jude's practice. (Major Dep. at 135). Giacobbe's guarantee was $10,000 more than the guarantee Moore dictated for Jones. (Major Dep. at 135, 147).

**B.**     **Plaintiff's Riverside Account**

Plaintiff's primary sales territory consisted of four Eps and Riverside hospital, where she spent the majority of her time, both selling and servicing the account. Jones immediately began building relationships with her physicians, repairing customer perception of St. Jude, and was observed to have good rapport with the customers. As a result, St. Jude's sales began "trending upward" at Riverside, as well as in Plaintiff's other accounts. (Major Dep. at 154, 181, 185–86). At that time, Jones was St. Jude's primary sales representative in Riverside, as Giacobbe was prohibited from selling any devices in the account until May 31, 2008, when his non-compete expired.

From July 2007 through January 2008, Plaintiff was the only St. Jude sales representative actively in Riverside selling and servicing the account, yet Giacobbe received sales credit for all the sales in Riverside during this period. (*See* Major Dep. at 67–68, 135; Suppes Dep. at 100–01; Jones Dep. at 190, 205). Plaintiff worked diligently on her accounts and experienced success in Riverside. (Major Dep. at 156). It was Major's opinion that she remain in Riverside, "[b]ecause in the short time that she had been at Riverside, our business was growing. She was able to get implants out of doctors that we were not getting before she started working there." (Major Dep. at 156).

Despite Plaintiff's success at Riverside in the fall of 2007, Moore directed Major to set up a meeting with Plaintiff. At the meeting, Moore proposed that Plaintiff release her Riverside territory in exchange for override commissions at OSU. (*See* Jones Dep. at 89; Moore Dep. at 99–100; Major

5

Dep. at 56–57, 65).  Override commissions are commissions received on device sales where the sales representative does not actively work the account.  (Major Dep. at 66; Jones Dep. at 90).  Although commissions from OSU may have increased Plaintiff's income in the short-term, Defendants' proposal, if accepted, would have an overall and long-term effect of limiting both Plaintiff's income and her career with the company.  (Jones Dep. at 89–90; Major Dep. at 66–67).  Plaintiff therefore declined the offer.

After Plaintiff left the meeting, Moore instructed Major to "[w]ait a couple months and take the account."  (Major Dep. at 67; Pl.'s Memo. in Opp. Ex. 4, at B).  Indeed, a couple months later, in late November or early December 2007, Moore directed Major to remove Riverside from Plaintiff's territory "based on performance."  (Major Dep. at 225).  Major responded, "[T]here's no negative performance to justify that."  Major did not remove Jones from Riverside.  (Major Dep. at 225-226).[2]

On January 1, 2008, Moore replaced Major with Fred Suppes ("Suppes"), a white, Caucasian male, as RSM for Columbus.  Shortly after starting in Columbus, Suppes hosted an introductory dinner for the region's sales team; both Jones and Major attended.  (Major Dep. at 209).  At the dinner, Suppes asked each team member to share an unexpected or amusing fact about himself.  Major shared that he was a pretty good hockey player, to which Suppes replied, "Oh, were you the puck?" (Major Dep. at 209–10).  Jones and Major were offended by the comment; so much so that Major wanted to "punch him [Suppes] in the mouth."  (Major Dep. at 210–11; Jones Dep. at 206–07).  Other members of the sales team were also uncomfortable and told Major they could not

---

[2] Major was demoted to a sales representative position on December 7, 2007, and he believes that one of the reasons he was demoted was because he refused to remove Riverside from Plaintiff's sales territory.  (Major Dep. at 225–26).

6

believe Suppes had said that.  (Major Dep. at 210–11).  Neither Jones nor Major felt any action would be taken by St. Jude if they reported this incident based upon their prior experiences and/or knowledge of the company; in fact, each feared retaliation should he/she make such a report.  (*Id.*).

## C.    Plaintiff's Sales Performance

On January 3, 2008, Plaintiff met with Moore to review her 2007 sales results and performance.  During this meeting, Moore did not identify any performance issues he had with her, nor did he tell her that he had any concerns regarding the sales at Riverside.  (Moore Dep. at 181–83; Jones Dep. at 104).  On January 11, 2008, Plaintiff had her first meeting with Suppes to discuss her business plan for her territory.  (Suppes Dep. at 82).  Suppes expressed no concerns regarding Plaintiff's performance or the volume of sales at Riverside.  (Jones Dep. at 111; Suppes Dep. at 84–85).  Nor did Suppes mention that there were any territory changes planned. (Suppes Dep. at 83–85).

## D.    Riverside is Removed from Jones' Sales Territory

On January 14, 2008, three days after meeting with Plaintiff for the first time, and only eleven business days after being designated her RSM, Suppes sent an email to Plaintiff informing her that Riverside was removed from her sales territory effective January 28, 2008.  Suppes claims that he was instructed to remove Riverside from Plaintiff's territory by Moore and that he had no input in the decision.  (Suppes Dep. at 87–88).  Conversely, Moore claims that it was Suppes' recommendation and decision that Plaintiff be removed from Riverside. (Moore Dep. at 93–94).

Riverside was Plaintiff's primary account and constituted 80% of her HV[3] implanters. (Jones

---

[3] High voltage devices include biventricular devices, defibrillators, and internal cardiac devices, which an EP typically implants.

Dep. at 203). Defendant St. Jude's removal of Riverside from Plaintiff's territory would negatively impact her future income. (Jones Dep. at 191–92; Major Dep. at 163–64). St. Jude did not offer Plaintiff any additional territories or replace the removal of the four Riverside EPs from her contract. (Suppes Dep. at 95). Nor did Jones' employment contract provide her with additional accounts in the future. (Pl.'s Memo. in Opp. Ex. 10).

Also, on January 14, 2008, St. Jude sent three white, male sales representatives emails indicating that they were being "removed" from accounts. (Suppes Dep. at 152–53; Pl.'s Memo. in Opp. Ex. 20; Moore Dep. at 190). Specifically, Giacobbe was allegedly "removed" from Riverside; and, Woyton and McQuarrie were "removed" from OSU. (*See* Pl.'s Memo. in Opp. Ex. 20). At the time of his "removal," Giacobbe was under a non-competition agreement and was not able to call on or sell St. Jude devices at Riverside. However, immediately after Giacobbe's non-compete expired, he was selling in Riverside. (Pl.'s Memo. in Opp. Ex. 8; Suppes Dep. at 100). Further, McQuarrie and Woyton were receiving commissions from OSU, though not selling to or servicing the account. (Pl.'s Memo. in Opp. Exs. 12, 13; Major Dep. at 156–57; Suppes Dep. at 154). Unlike Woyton and McQuarrie, Plaintiff was not given an account to replace the one taken from her. Plaintiff was left with only one EP, Dr. Noble.

**E.      Plaintiff Complains of Discrimination and Disparate Treatment**

On January 15, 2008, the day immediately following her notification that Riverside was to be removed from her territory, Plaintiff emailed Suppes, copying Moore and Valle, complaining, that there was a "disparity in treatment" between herself and the white, male sales representatives. (Jones Dep. at 111–12; Pl.'s Memo. in Opp. Ex. 22).

In response to Plaintiff's email, Moore emailed Suppes a spreadsheet claiming that Plaintiff's

sales revenues in Riverside were 32% less than the previous year's sales.  (Suppes Dep. at 161; Pl.'s Memo. in Opp. Ex. 23).  Suppes then advised Plaintiff that Riverside had been removed from her territory because of her low sales performance.  (Jones Dep. at 114; Pl.'s Memo. in Opp. Ex. 24).  However, Moore's 2007 sales numbers for Riverside (as contained on the spreadsheet sent to Suppes) were misleading and differed greatly from the sales numbers that Plaintiff had been provided by her prior RSM, Major, in December 2007.  (Major Dep. at 219–25; Pl.'s Memo. in Opp.  Ex. 9; Ex. 4 at C).  According to Moore and his spreadsheet, Jones had "sold" a negative number of HV units in August 2007.  (*See* Pl.'s Memo. in Opp. Ex. 23, at FS 293–95).  In actuality, Riverside had substantial sales in August 2007; the negative figure on Moore's spreadsheet was a result of a $187,000 warranty credit Moore authorized against Jones' sales.  (Pl.'s Memo. in Opp. Ex. 4 at D and Ex. 25 at B).  The warranty credit was not the result of any of Jones' sales, but was a credit resulting from Pacesetter sales in Riverside prior to Jones' transfer to Columbus.  Despite being aware that Rooney was the responsible sales representative, Plaintiff was assessed the warranty credits.  (*See* Major Dep. at 222–25; Pl.'s Memo. in Opp. Ex. 23).

In response to Defendants' claim that her sales performance was poor, Plaintiff immediately presented St. Jude with evidence of her true sales numbers on January 17, 2008.  Plaintiff pointed out that Moore had inflated St. Jude's market share for Riverside by $4 million. (Pl.'s Memo. in Opp. Ex. 26).  Plaintiff also alerted Moore and Suppes to the fact that the purported sales revenue upon which they relied did not correspond with her actual sales, nor did it correspond to the hospital's records.  Finally, Plaintiff pointed out that the difference in the sales numbers was largely attributable to Riverside's own records which show sales of $91,387.00 worth of St. Jude devices to the hospital in August 2007.  Further evidence of Plaintiff's sales, produced by St. Jude in discovery, reflect that

Plaintiff had sales numbers of $280,210 in August 2007. (Pl.'s Memo. in Opp. Ex. 4 at C and Ex. 15; Galeano Aff.).

Defendants did not respond to Plaintiff's emails dated January 15th and January 17th, 2008. After waiting a month for a response from Defendants, on February 13, 2008, Plaintiff contacted her HR representative, Valle, and stated that she wished to file a formal complaint. (Valle Dep. at 150–51; Pl.'s Memo. in Opp. Ex. 27). Instead of commencing an investigation, Valle scheduled a telephone conference with Plaintiff on February 14, 2008. During their conference, Valle advised Jones that her removal from Riverside could not have been based on sales because she, Valle, would have been made aware of a performance issue prior to the account being removed.[4] (Jones Aff., Pl.'s Memo. in Opp. Ex. 9 at C; Valle Dep. at 60–61, 152). Prior notification to Human Resources of performance issues before removing a sales account is consistent with St. Jude's policy and practice. (Valle Dep. at 60–61, 152). During the call, Valle did not answer Plaintiff's questions; instead, she scheduled an in-person meeting on February 20, 2008, with Plaintiff, Suppes and herself to discuss the situation. (Valle Dep. at 153–55; Jones Dep. at 150–51).

On February 20, 2008, Plaintiff, Valle, and Suppes met in-person to discuss Plaintiff's complaints of discrimination relating to the removal of Riverside from her territory.[5] Prior to this meeting, Suppes told Jones she was removed from Riverside because of poor sales performance. At the meeting, Defendants claimed that Riverside was removed from Plaintiff's territory because her

---

[4] Plaintiff tape-recorded the conversation to protect herself and as a precaution for her job and reputation. (Jones Aff.; Pl.'s Memo. in Opp. Ex. 9 at C). At the time, Jones was unaware such recording was prohibited by St. Jude, as she did not have access to a St. Jude Employee Handbook. (Jones Dep. at 131–32).

[5] Plaintiff tape-recorded this meeting as well. (Jones Aff.; Pl.'s Memo. in Opp. Ex. 9 at D). Additionally, Valle took notes that she later typed to place in Jones' file. (Valle Dep. at 157; Pl.'s Memo. in Opp. Ex. 30).

territory was geographically too large. (Jones Dep. at 128; Valle Dep. at 158). Plaintiff then pointed out

that her sales territory was actually geographically smaller than the territories of the majority of her white, male counterparts. (Jones Dep., 128; Valle Dep., 158). Defendants next claimed that the physicians at Riverside wanted a "more technical rep" and that Dr. Kidwell had said that Plaintiff was not their "first, second, or third choice" of a sales representative. (Jones Dep. at 128; Valle Dep. at 160). Plaintiff again argues that this was not accurate because, at the time Defendants removed Riverside from her territory, they had not received comments from, nor spoken with any of the Riverside physicians regarding Plaintiff. (Suppes Dep. at 105–06 (stating that "due diligence" in the accounts was not conducted until after January 14, 2008, the announcement of her removal)).

Plaintiff followed up this comment by speaking with Drs. Kidwell and Fu by telephone about the issue of her technical skills.[6] Dr. Kidwell denied the claim, stating, "I said nothing of the sort." (Kidwell Tr. 3). Similarly, Dr. Fu stated, "I never said anything about your technical competence. I never said that you were never my first, second or third choice. . . . I never had an issue." (Fu Tr. 3–4, 8).

The final reason that Defendants gave Plaintiff as a basis of removing Riverside from her territory was because Heather Connelly ("Connelly"), the Electrophysiology Laboratory ("EP Lab") Manager at Riverside, allegedly told Suppes that Jones was "dangerous" and had put patients at risk. (Jones Dep. at 128; Valle Dep. at 160; Pl.'s Memo. in Opp. Ex. 30 and Ex. 9 at D). Again Plaintiff followed up this reason by calling Connelly, who denied making any of the alleged statements.

_____

[6] Plaintiff tape-recorded each of these conversations to ensure accurate documentation of the calls and had transcripts of the recordings prepared. (Jones Aff., Pl.'s Memo. in Opp. Ex. 9).

(Connelly Aff.; Pl.'s Memo. in Opp. Ex. 31 at B, 4).  In fact, Connelly is recorded as representing that professionally she had "no problems" with Jones, that Jones was good at follow up and was here [in Riverside] in a timely fashion and that she thought Jones was "a fine rep."  (Connelly Aff.; Pl.'s Memo. in Opp. Ex. 31 at B, Tr. 7, 12).  Further, Connelly stated that Suppes had not even talked to her about Plaintiff until after it had been announced that Plaintiff was being taken out of Riverside. (Pl.'s Memo. in Opp. Ex. 31 at B, Tr. 6).

After the February 20th meeting, Defendant proposed to reinstate Plaintiff to Riverside, however, the proposal only included assignment of two EPs, rather than the four she had previously been assigned.  Further, she was offered substantially reduced commissions rates of 5% LV and 3% HV.  Plaintiff rejected Defendants' proposal to be reinstated to Riverside under these terms because she would earn little to no commission income from the account.  (Jones Dep. at 147, 154).  Then, on February 29, 2008, Defendants proposed that Plaintiff return to Riverside under one of the following two scenarios: (a) assignment of two EPs, Drs. Kidwell and Kleman, at rates of 10% LV and 6% HV; or (b) assignment of all five EPs at Riverside, Drs. Kidwell, Kleman, Fu, Nichols and Nelson, at commission rates of 2.5% LV and 1.5% HV.  (Jones Dep. at 147; Pl.'s Memo. in Opp. Ex. 31).  Plaintiff, in considering this second option, advised Defendants that her acceptance would be contingent upon Moore's agreement to accompany her into the account as a demonstration of St. Jude's support and to invalidate St. Jude's defamatory comments and innuendo regarding her alleged technical incompetency and "dangerousness."  Yet, Moore did not agree.  (Jones Dep. at 161–62).

## F.    Plaintiff's FMLA Leave

Plaintiff is a single, working mother and the sole financial support for her son.  When her largest account and what would be her primary source of commission was removed and not replaced,

12

she suffered tremendous anxiety and stress. Plaintiff was humiliated and embarrassed by Defendants'

treatment of her, their comments regarding her professional competency, and the negative impression

that was left within Riverside and among her peers. (Jones Dep. at 155–56). Because of her anxiety

and stress, Plaintiff's physician placed her on FMLA leave from March 7, 2008, through May 25,

2008. (Jones Aff., Pl.'s Memo. in Opp. Ex. 9).

When Jones returned from FMLA leave, Defendants again proposed that she only be

"reinstated" to Riverside under one of the two options previously discussed and that she make her

decision by June 24, 2008. (Jones Dep. at 167; Pl.'s Memo. in Opp. Ex. 37).

**G.     Plaintiff's Charge of Discrimination with the EEOC**

Plaintiff filed a charge of discrimination with the EEOC on June 27, 2008. That same day,

Plaintiff responded to Moore's territory options. (Pl.'s Memo. in Opp. Ex. 37). Jones accepted the

option to work with all five EPs at Riverside and simultaneously apprised Moore of her EEOC

Charge. Jones also requested that, before going back into the account, Moore launch a full

investigation of the comments made about her performance to aid in the repair of her relationships

at Riverside. (Jones Dep. at 169). St. Jude did not conduct an investigation. (Jones Dep. at 170).

Instead, Moore then offered Plaintiff override commissions at Riverside so she would not have to go

into the account, allegedly leaving her physician relationships there tarnished. (Jones Dep. at 170;

Pl.'s Memo. in Opp. Ex. 38; Suppes Dep. at 213).

Defendant St. Jude has an equal opportunity policy that applies to all employment decisions,

including job assignments. (Valle Dep. at 58). St. Jude employees who feel they have been the

subject of discrimination and/or retaliation are directed to their HR Manager. (Valle Dep. at 58). It

is then the obligation of the HR Manager "to thoroughly investigate the complaint in a timely

manner." (Valle Dep. at 58). Valle, Jones' HR Manager, defined timely as being less than one week after a complaint is received. (Valle Dep. at 58–59). Valle claims she then investigated Plaintiff's complaint of discrimination because of the inconsistencies and discrepancies in the information provided to her by Jones and Defendants. (Valle Dep. at 167). It was Valle's typical practice to prepare a written report and recommendation summarizing her investigation. (Valle Dep. at 172). However, Valle did not recall preparing a report in Jones' case and no such report was produced during the course of discovery. (Valle Dep. at 171).

On May 16, 2008, St. Jude's general counsel advised that a "full investigation" of Jones' complaints had been completed. (Valle Dep. at 204, Ex. 45; Suppes Dep. at 226). However, Plaintiff asserts that St. Jude's "full investigation" failed to include: an interview with Major, the only other African-American in the region and Jones' former RSM; any interviews with other sales representatives in the region; an investigation of the false statements Suppes made to Jones in their February 20, 2008 meeting; and an investigation of the "hockey puck" comment made by Suppes about Major. (Valle Dep. at 214).

On May 29, 2008, four months after Jones' complaint, Valle and Rob Dunn ("Dunn"), St. Jude's in-house counsel, began interviewing other personnel in Columbus. (Valle Dep. at 216–17; Pl.'s Memo. in Opp. Ex. 35). However, St. Jude limited its investigation to the "hockey puck" comment, and did not investigate Plaintiff's other complaints. (Valle Dep. at 218). At no point was the removal of Riverside from Jones investigated; the reasons given for the removal were not examined; the disparate treatment of Jones as compared to the white, male sales representatives was not questioned; and, St. Jude did not take steps to independently verify Jones' performance or sales. (Valle Dep. at 141, 143, 159–62, 212). St. Jude simply accepted Moore's explanation at face value.

(Valle Dep. at 209).

During the investigation, Valle was heard referring to Plaintiff as a "worthless piece of sh*t." (Suppes Dep. at 148; Major Dep. at 216–17). And, Valle admitted that she had stopped reading and responding to Jones' emails. (Valle Dep. at 232–34). Suppes was not interviewed about the "hockey puck" comment until almost six months after it occurred. (Suppes Dep. at 231). Valle testified that she recommended Suppes' termination, and he was terminated for cause. (Valle Dep. at 56). Moore, however, refused to acknowledge any problem with Suppes' comment or that his comment warranted termination. (Moore Dep. at 91–92; Suppes Dep. at 233). Suppes was replaced by a new RSM, Harold Ellen ("Ellen"), in September 2008. (Ellen Dep. at 31–32; Moore Dep. at 237).

Plaintiff also asserts that Defendants discriminated and retaliated against her by failing to assist her in providing adequate coverage for her territory. Plaintiff Jones says that she learned that she was the only sales representative without a dedicated TSS. (Pl.'s Memo. in Opp. Ex. 39). A technical sales specialists ("TSS"), works with sales representatives in a more clinical, service oriented role, and provide follow up to check and monitor devices. She further describes that on several different occasions, her requests for coverage assistance were ignored. (*See* Pl.'s Memo. in Opp. at 30-32).

## H.    Plaintiff's 2008 Annual Performance Appraisal

Despite having been the RSM for only three months, Ellen was required to complete the 2008 annual performance appraisals for St. Jude's Columbus team. (Ellen Dep. at 199–201; Valle Dep. at 26). Ellen completed all performance appraisals for the male sales representatives and reviewed them with the men on March 19–20, 2009. (Ellen Dep. at 216, 219, 221–23). Almost three weeks later, on April 7, 2009, Ellen gave Plaintiff her performance appraisal. (Ellen Dep. at 255–57; Pl.'s Memo. in Opp. Ex. 49). Ellen testified that in completing these performance appraisals, he rated the

representatives in five categories, with the most heavily weighted category being sales. (Ellen Dep. at 217). Ellen gave all the St. Jude male sales representatives, Woyton, Giacobbe, Major, Rooney, and Stohr, an overall rating of "4," an "exceeds expectations." (Ellen Dep. at 232; Pl.'s Memo. in Opp. at 45–48). Plaintiff, the sole female sales representative, was given an overall rating of "2" below expectations. (Ellen Dep. at 261; Pl.'s Memo. in Opp. Ex. 49). Plaintiff questioned Ellen about her low rating and he told her, "Some changes were made to your review." (Jones Dep. at 209). Ellen told Jones that he originally gave everyone a "4," including her, but that Moore directed him to lower her appraisal to a "2." (Jones Dep. at 208–10). Moore did not make changes to anyone else's performance appraisal. (Ellen Dep. at 208–09).

Jones drafted a rebuttal to her performance appraisal on April 24, 2009, addressing each item on her performance appraisal. (Ellen Dep. at 273; Pl.'s Memo. in Opp. Ex. 53; Valle Dep. at 232). On May 4, 2009, Defendants, through Ellen, responded by simply stating that Jones' performance appraisal was based on her sales results. (Ellen Dep. at 277; Pl.'s Memo. in Opp. Ex. 52).

In April 2009, less than a month after giving Plaintiff her low performance appraisal, Defendants began recruiting a new sales representative to assume Plaintiff's limited sales territory. (Ellen Dep. at 101–03, 115; Pl.'s Memo. in Opp. Ex. 54). Jones confronted Ellen by email stating, "It is extremely embarrassing and humiliating to have my customers in Newark and Zanesville confront me about why Suzi Williams is asking them to support her as the St. Jude Sales Representative when in fact, I am the St. Jude Medical sales representative in the area." (Pl.'s Response Ex. 54). In response, Ellen told Jones that St. Jude was looking for someone to "partner" with her, even though Jones' territory only had one EP and, as a whole, would not support more than one sales representative. (Ellen Dep. at 111; Major Dep. at 165).

16

In July 2009, St. Jude learned that a new EP, Dr. Migeed, was joining Genesis Health Care in Zanesville, Ohio ("Genesis"). Jones and Major each were assigned specific physician accounts at Genesis. At the time Dr. Migeed arrived, Major had at least six EPs and Jones had only one, Dr. Noble. Defendants gave the new account to Major, not Jones. (Major Dep. at 26-36). At the time the decision was made to give this opening to Major, Jones had just received her poor performance appraisal. (Major Dep. at 28–30). St. Jude's policy was that any type of written disciplinary action, performance review rating of "below expectation," or a PIP will prevent an employee from posting for a transfer or moving into an opening. (Valle Dep. at 68).

## I.    Dr. Noble Account

In February 2009, Major requested that Moore provide a way for him to receive commission credit on Dr. Noble's sales, in addition to the commission Jones was already receiving because Major had been assisting Jones in building her relationship with Dr. Noble.[7] (Major Dep. at 229–30, 233). Major was aware that other white sales representatives had been given such a commission arrangement. (Major Dep. at 234). Moore refused, and instead required Jones to choose to split her Dr. Noble commissions or Major would receive nothing. Plaintiff could not agree financially to such a reduction of her commissions. (Jones Dep. at 184). Moore then faulted her for not "work[ing] in partnership with" Major. Later, Moore used his decision to not change the commission structure on Dr. Noble's sales to justify his removal of Dr. Noble's account from Jones and to place her on a PIP.

A few weeks after Plaintiff refused to reduce her commission on Dr. Noble's account, on

---

[7] Initially, Plaintiff offered to share her commissions from Dr. Noble with Major. However, after Defendants removed Riverside from Plaintiff, in January 2008, she was no longer financially able to share any commissions from Dr. Noble's account. (Jones Dep. at 183–84; Major Dep. at 232).

March 10, 2009, Ellen acknowledged that Jones' efforts were increasing sales with Dr. Noble, but that he was "getting a lot of pressure" to take her out of the account. The pressure on Ellen mounted and, on June 4, 2009, he wrote Moore stating, "I'd like to talk to you more about your decision to remove Chyrianne from Dr. Noble." (Ellen Dep. at 282–83). Moore attempted to shift responsibility for the decision away from himself stating, "This is your decision not mine. I am just clearing the path for you . . . ." Ellen did not remove Dr. Noble's account from Jones that day. Nonetheless, two weeks later, and with a sudden absence of emails between Ellen and Moore, Jones was removed from Dr. Noble's account because of her "sales numbers." Major was then assigned to the Noble account. (Ellen Dep. at 281–86).

**J.     Plaintiff's Termination in RIF or Placed on a PIP**

In August 2009, St. Jude began a RIF. Defendants identified three individuals in Columbus for participation in the RIF: Chris Webb, a white, male associate sales representative assigned to Riverside; Andrew Fitzpatrick, a white, male TSS; and Plaintiff Jones, the only female and one of two black sales representatives in the region. The individuals to be selected for the RIF were to be either employees at will or those that were under-performing based on sales. Of these three individuals, only Jones was selected for termination. Defendants gave Jones the options of: (a) being terminated as part of the RIF; or (b) being placed on a PIP. Plaintiff elected to be placed on a PIP rather than lose her job. (Jones Dep. at 236; Moore Dep. at 264-267).

On August 18, 2009, Defendants placed Plaintiff on a PIP as part of their "RIF." (Moore Dep. at 266–67). In the PIP, Moore criticized Jones for not achieving expected sales results in her territory. Moore set Jones' sales quota at 12 LV units per month, contending that the market potential in her territory was 405 units per year (roughly 34 units per month). In setting these sales

goals, Moore used the market potential for the entire hospitals identified in Jones' contract, despite the fact that Jones' sales territory did not include the entire hospitals, only certain, limited physicians at each hospital.  According to Major, the market potential for the specific doctors in Jones' contract was about 160 units per year, 60% less than what Moore claimed. (Major Dep. at 253).  Further, the sales quota Moore set for Plaintiff required that she exceed St. Jude's national market share in her territory.  St. Jude's national market share is 28%; however, Moore's sales quota of 12 units per month would require Jones to achieve a market share of 35%, utilizing Moore's market potential of 405 units per year.  (Ellen Dep. at 138; Moore Dep. at 268–69).

Moore also placed Major on a PIP that required Major, in just three weeks, to generate $2,700,000 in sales during the Christmas season.  Major did not accept the PIP because he believed it was a way for Moore "to document why I was fired." (Major Dep. at 204–05).  In lieu of the PIP, Major was demoted to sales representative. (Major Dep. at 206).

In a similar situation, Moore demanded that Hudson, an African-American male reporting directly to him, accept a demotion from RSM to sales representative while planning to give Hudson a historically low-sales territory that had to be "turned around" in three months. Hudson attested, "Moore was setting me up to fail by using inflated and unrealistic performance goals as a pretext to terminating me because of my race.  Moore was presenting me with a territory that was unlike any assigned to white Caucasian sales representatives. The sales expectations set by Moore were unattainable in the time frame that would have been expected of me.  It is my belief that Moore would have used the low sales of the territory he wanted to assign me as a reason to terminate me from St. Jude at the end of the year." (Hudson Aff., Jones MSJ Ex. 17 at ¶19–20.)

Defendants then rehired Ellen who was terminated during the RIF, and also hired two new

sales representatives in Columbus after the RIF: Lewis Antol, a white, male sales representative for Columbus, and Brett Douglas, another white, male sales representative.

While on her PIP, Plaintiff was required and did submit weekly progress reports. In these reports, she documented each implant; however, Moore refused to credit her for many of the implants because some of the physicians were "not in her contract." (Moore Dep. at 273, 277). Jones had implants with at least four physicians not in her contract. She was expected to call on these physicians, but she did not receive credit for the implants. (Moore Dep. at 278).

On October 7, 2009, Defendants extended Plaintiff's PIP by two months, from October 18, 2009, to December 4, 2009. During this extension, Moore changed the period of time by which he was measuring her sales performance, using calendar months rather than measuring from the date Jones was placed on the PIP. (Moore Dep. at 275–77). By making this change, Moore omitted four implants from Jones' sales and, in addition, two other implants were excluded. Plaintiff's numbers indicated her October sales to be ten units, while Moore's reflected four units. Consequently, Moore found Jones' sales were deficient and recommended her termination. (Moore Dep. at 278–79).

## K.    Plaintiff's Termination

Defendants terminated Plaintiff on December 17, 2009 based on her poor sales performance. Plaintiff was the only African-American female employed in Columbus. St. Jude selected 188 (11.75%) of its 1600 employees for participation in its RIF. Of those 188 RIF'd employees, 15 employees were African-American and 74 were female. Of the total workforce of 1600 employees, 496 (31%) are female. St. Jude terminated 74 of its 496 female employees, or 15%. In comparison, of St. Jude's 1600 employees, only 48 (3%) are African-Americans; and St. Jude terminated 15 of these 48 African-American employees as part of its RIF. (Pl.'s Memo. in Opp. Ex. 64). St. Jude

terminated 31.25% of its African-American employees in its RIF.  In contrast, St. Jude terminated only 11% of its white employees and only 10% of its male employees as part of its RIF.  (Pl.'s Memo. in Opp. at 42-44).

St. Jude also claims, in part, that Plaintiff was terminated because she recorded conversations with St. Jude employees and customers in violation of company policy.  Plaintiff asserts that she recorded conversations to defend herself against Defendants' discriminatory and retaliatory actions and to document the ongoing false allegations made against her by Defendants. For example, Plaintiff recorded her conversations with Connelly, and Drs. Fu and Nichols, to refute St. Jude's statements attributable to each of these individuals.  (Jones Dep. at 137–38).  Similarly, Jones also recorded conversations with Drs. Morrice, Brantley, and Poole regarding St. Jude and Rooney's allegation that they (the physicians) were no longer using St. Jude devices when referring patients to OSU.  Plaintiff made the calls and had the conversation with these three physicians only because she was instructed to do so by Ellen, who told her to get to the bottom of it.  Plaintiff asserts that she had to record the conversations to prove to Ellen that she was not the problem.  (Jones Dep. at 137–38).

Defendants first learned of the existence of Plaintiff's recordings during the parties' May 8, 2009, mediation.  Despite knowing of these recordings, St. Jude waited seven months, until December 2009, to terminate Jones.

## L.    The Instant Action

Plaintiff initiated this action on November 6, 2008, alleging that she suffered various adverse employment actions and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*., 42 U.S.C. § 1981, the Equal Pay Act, 29 U.S.C. §206(d), and Ohio Revised Code § 4112, §4111.17.  On December 30, 2010, Defendants filed a Motion for Summary Judgment,

seeking judgment in their favor on all claims. (Doc. 61). This motion has been fully briefed and is ripe for review.

## II.   SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587.  The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53.  Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978).  The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (*quoting Liberty Lobby*, 477 U.S. at 257).  The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III.    DISCUSSION

Plaintiff Jones asserts the following employment discrimination claims, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, 42 U.S.C. § 1981, the Equal Pay Act, 29 U.S.C. §206(d), and Ohio Revised Code § 4112, §4111.17:  (1) race and gender discrimination; (2) hostile work environment; (3) retaliation; (4) wage discrimination; and (5) violation of the Equal Pay Act  (Compl. ¶¶ 40-103).   Defendants move for summary judgment on all claims.  The Court will address each of Plaintiff's claims in turn.

## A.    Plaintiff's Employment Discrimination Claims

Plaintiff Jones asserts that she was the victim of employment discrimination based on her race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Ohio Revised Code Chapter 4112.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(A)(1).

Employment discrimination is also prohibited by 42 U.S.C. § 1981(a), which states in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every

24

State and Territory to make and enforce contracts ... as is enjoyed by white citizens." The United States Supreme Court acknowledged the "necessary overlap" between Title VII and § 1981, but noted that the "remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 455 (2008) (quoting *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 461 (1975)). For example, Title VII provides for administrative remedies. *Id.* In *CBOCS West, Inc.*, the Supreme Court held that § 1981 applies to retaliation claims. *CBOCS West, Inc.,* 553 U.S. at 447. In considering employment discrimination and retaliation claims brought pursuant to § 1981, the Court utilizes the same analytical framework applied to claims under Title VII. *See, e.g., Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir. 2003); and *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n. 2 (6th Cir. 2000).

Likewise, in analyzing employment discrimination and retaliation claims brought under Ohio Revised Code Chapter 4112, the Court utilizes the same analytical framework applied to claims under Title VII. *See Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607 (1991); *Plumbers and Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission*, 66 Ohio St.2d 192, 196 (1981) (holding that the Ohio Supreme Court, in considering employment discrimination claims under Ohio Revised Code Chapter 4112, adopts the tests established by the federal courts for assessing claims under parallel anti-discrimination statutes).

### 1.     Plaintiff's Race Discrimination Disparate Treatment Claims

Plaintiff alleges the following instances of disparate treatment based on her race and sex: (1) removing Riverside from her sales territory in January 2008; (2) giving her a "2" (below expectations) on her 2008 performance evaluation in April 2009; (3) removing Dr. Charles Noble from her sales

territory in June 2009; (4) placing her on a PIP; and (5) terminating her employment in December 2009. Defendants maintain they are entitled to judgment in their favor on each of these alleged disparate treatment claims. The Court agrees.

In order to prevail in an employment discrimination disparate treatment claim, a plaintiff must either present direct evidence of discrimination or rely upon the burden-shifting scheme set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to create an inference of discrimination. *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 402 (6th Cir. 1999). Plaintiff, in her Memorandum in Opposition, fails to offer any direct evidence of race discrimination, stating "Discrimination claims substantiated by circumstantial evidence, such as Jones' claims, are established by the burden-shifting analysis set forth in McDonnell Douglas." (Pl.'s Memo. in Opp. at 48).

To establish a *prima facie* case of employment discrimination based on race and sex, a plaintiff must present circumstantial evidence demonstrating the following elements: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the position; (3) that the defendant subjected the plaintiff to an adverse employment action; and (4) that the defendant did not subject similarly situated persons outside the protected class to such adverse action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *McDonnell Douglas Corp.*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *See id.*; *Burdine*, 450 U.S. at 252-53. If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden returns to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See id.*; *Burdine*, 450 U.S. at 253. "The nature of the

26

burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. at 253. This burden-shifting framework is intended to be flexible in differing factual circumstances. *See e.g.*, *Christian v. Wal-Mart Stores, Inc,*. 252 F.3d 862, 869-70 (6th Cir. 2001), citing *Burdine,* 450 U.S. at 254 n. 6.

In the instant case, Defendants contend that Plaintiff fails to establish a *prima facie* case of discrimination for each of the following alleged claims. For each of Plaintiff's disparate treatment claims, it is undisputed that Plaintiff, as an African-American female, is a member of a protected class. Further, Defendants do not dispute that Plaintiff was qualified for the position of sales representative, satisfying the first and third elements.

(a)      **Removing the Riverside Account from Plaintiff's Sales Territory**

Defendants maintain that Plaintiff fails to establish a *prima facie* case of discrimination with respect to this claim because (1) it did not constitute an adverse action; and (2) she cannot identify similarly situated individuals who were treated more favorably. Finally, Defendants assert that they are entitled to summary judgment on this claim because they have asserted a legitimate, nondiscriminatory justification for denying the pay adjustment, and Plaintiff cannot demonstrate that the proffered reason is a pretext for discrimination.

i.      **Adverse Action**

Plaintiff was notified on January 14, 2008 that Riverside and its associated physicians would be removed from her sales territory effective January 28, 2008. After this account was removed, she was left with only one EP, Dr. Noble, who exclusively used a competitor's product. Therefore,

27

Plaintiff argues that after her guarantee expired and her income was based solely on commissions, her earnings would drastically decrease. Plaintiff asserts that this loss of income is an adverse employment action, relying on *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) (holding that a denial of money qualifies as an adverse employment action to any employee for Title VII purposes).

Defendants contend that Plaintiff's removal from the Riverside account and then the attempt to reassign her to the account as part of a new team of four sales representatives was not an adverse employment action because she did not accept the offer to return to Riverside. Defendants assert that the creation of sales teams can actually increase commission payments based on increased sales, even though sales representatives may have to accept a lower commission rate. Since Plaintiff refused to join the Riverside sales team, it is unknown what Plaintiff's sales revenue would have been had she agreed to join the team. Defendants argue that refusing a lateral transfer "precludes [a plaintiff] from arguing that her termination [or other resulting employment action] was an 'adverse employment decision' for the purposes of establishing a *prima facie* case." *Darnell v. Campbell County Fiscal Court*, 1991 U.S. App. LEXIS 1755, at *7 (6th Cir. 1991).

The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of [plaintiff's] employment because of [the] employer's conduct." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004) (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Hollins*, 188 F.3d at 662. "Examples of adverse employment actions include firing, failure to promote, reassignment with significantly

28

lower responsibilities, a material loss of benefits, suspensions, and other indicies unique to a particular situation." *Smith,* 378 F.3d at 575-76, (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)).

In the instant case, there is some question as to whether Plaintiff may have actually made more money had she joined the new sales team at Riverside, or even accepted the OSU position. Nonetheless, construing the facts in the light most favorable to Plaintiff, when Riverside was removed from her territory, it substantially reduced Plaintiff's job responsibilities and decreased her ability to earn commissions. Accordingly, the Court concludes that Plaintiff has sufficiently demonstrated the adverse action element of her *prima facie* case.

### ii. Similarly Situated

Defendants also argue that Plaintiff has failed to establish that she was treated differently from similarly situated employees outside of her protected class in the removal of Riverside from her sales territory. Defendants point out that three Caucasian male co-workers (Paul Giacobbe, Doug Woyton, and Jim McQuarrie) had accounts removed on the same day as Plaintiff and all three were made a part of the new Riverside sales team, some at commission rates comparable to or lower than those offered to Plaintiff.

Similarly situated employees are ones who have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In determining whether an allegedly comparable employee is similarly situated, the ultimate question is whether "all of the *relevant* aspects of [his] employment situation were 'nearly identical' to those of the [comparator's]

employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998); *Clayton v. Meijer*, 281 F.3d 605, 611 (6th Cir. 2002). However, the burden of pointing to a "similarly situated" employee is not onerous and a plaintiff need not demonstrate similarity in all respects. *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 394-96 (6th Cir. 2008).

Defendants concede that Plaintiff Jones is similarly situated to Woyton, McQuarrie, and Giacobbe. Plaintiff first argues that she was treated less favorable that Mr. Giacobbe because he was not actually removed from the Riverside account. Plaintiff's argument is based solely on the fact that Mr. Giacobbe's contract contains no addendum removing him from the Riverside account. However, Defendants point out that Plaintiff's own contract does not contain such an addendum either, and it is undisputed that she was removed from the Riverside account. Rather, Plaintiff herself testified that when the emails were sent notifying her and Mr. Giacobbe that the Riverside account would be removed from their respective territories that Mr. Giacobbe was "angry," and that both of them were "stunned" by the decision. (Jones Dep. at 108-09).

At the same time Plaintiff and Mr. Giacobbe were removed from Riverside, Mr. Woyton and Mr. McQuarrie were removed from Ohio State and they were all offered a position on the newly formed sales team at Riverside. Plaintiff was offered commission rates equal to or higher than the white males on the new sales team, and/or commissions on an equal or greater number of doctors. Plaintiff was offered two doctors at 10% for low-voltage devices, and 6% for high-voltage; or all five doctors at 2.5% for low-voltage devices and 1.5% for high-voltage. (Jones Dep. at 153-54, Ex. 14). Whereas Mr. Woyton was assigned to only three of the five doctors at rates of 2.5% for low-voltage and 1.5% for high-voltage. Mr. McQuarrie was assigned to only two of the five doctors at 2.5% for low-voltage devices and 1.5% for high-voltage. (Moore Dep. at 133, 145, Exs. 6-7).

Plaintiff is essentially arguing that her similarly situated male co-workers were unaffected by their reassignments whereas she was left with fewer EPs than the others. However, that is not the issue. The issue is whether Plaintiff was treated less favorably than other employees with respect to the removal of the Riverside account. During this realignment, Plaintiff lost four EPs, Mr. Giacobbe lost five EPs and Woyton and McQuarrie each lost nine EPs.

Additionally, Plaintiff argues that in the three years after the removal of the accounts, Giacobbe, Woyton, and McQuarrie had other accounts added to their territories. However, Plaintiff has failed to offer any evidence that there is any connection between the decision to remove Riverside from her sales territory and the subsequent decisions to add doctors to other sales representatives' territories. Rather, Defendants assert that there is evidence to show that the other sales representatives received additional EPs later because their non-compete agreements covering those doctors expired.

Based on the aforementioned, Plaintiff has failed to show that she was treated differently than other similarly situated employees and therefore has failed to establish a *prima facie* case of race and sex discrimination with respect to the removal of Riverside from her sales territory.

### iii. Pretext

Finally, even if Plaintiff could set forth a *prima facie* case with respect to her claim for disparate treatment based upon the removal of Riverside from her sales territory, Defendants argue that they would still be entitled to judgment on this claim because Plaintiff has not met her burden to demonstrate that Defendant's legitimate proffered reason for the removal is a mere pretext for discrimination. Defendants assert that their legitimate non-discriminatory reason for Plaintiff's termination is that the Riverside and OSU accounts were removed from the four sales representatives

31

because they were trying to build sales teams that could work together better and increase the market share in the region. (See Defs.' Mot. at 29).

Defendants describe that at the beginning of 2008, they saw problems with both the Ohio State and Riverside accounts. Specifically, with the Ohio State account, Mr. McQuarrie and Mr. Woyton were not being received well by the physicians and did not work well with Tim Rooney, the other sales representative in that account. At Riverside, Mr. Giacobbe and Plaintiff's market share in the account was 5 to 6 percent, which was significantly lower than St. Jude's national market share of approximately 30 percent. In addition, sales were down 32 percent in the account over the prior six months compared to the first half of 2007. Defendants argue that Plaintiff cannot show that these reasons are false because she testified regarding the problems with the Ohio State account and furthermore she does not dispute that Riverside had a low market share. (Jones Dep. at 111-14).

"An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.'" *Id.*, (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)). In examining whether the stated reason is pretext, the Court must determine whether the employer reasonably relied on the particularized facts before it at the time it made the employment decision. *Smith*, 155 F.3d at 807. The employer is not required to show that it left no stone unturned; rather, the issue is whether the employer made a reasonably informed and considered decision before taking the adverse employment action. *Id.* The Court should not blindly accept the proffered reason as honest. *Id.* If the employee

adduces evidence establishing that the employer failed to make a reasonably informed and considered decision, then its decisional process is "unworthy of credence," and any reliance by the employer on such a process cannot be deemed "honestly held." *Id.* at 807-08.

In an attempt to demonstrate pretext, Plaintiff asserts that Defendants have changed and shifted their reasons for removing Riverside from her sales territory, indicating a lack of truthfulness. Plaintiff relying on *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131 (2d Cir. 1987), and *Edwards v. USPS*, 909 F.3d 320 (8th Cir. 1990), argues this Court, like the *Schmitz* and *Edwards* courts, should reject Defendants proffered non-discriminatory reasons for removing Riverside from Plaintiff's sales territory because they were shifting.

The Sixth Circuit, in *Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006), addressed this "shifting" argument, holding that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Id.* at 595; *see also Thurman v. Yellow Freight Sys. Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). *Asmo* held that the employer's changed explanation from what it originally gave the employee to what it later gave the civil rights agency and in the decision maker's deposition required that the matter be submitted to a jury. In *Asmo*, the manager gave the employee five reasons for her termination when the employee learned of her dismissal. However, when the company responded to the civil rights commission and during the manager's deposition, the company and manager only cited three reasons for the employee's termination. The *Asmo* Court concluded:

> It is unclear how Santoro [the manager] initially came up with these [five] reasons for termination, but the fact that they were later eliminated, and they happen to be the two reasons that Santoro gave that are false, is very suspicious. It appears that Santoro offered any and all reasons he could think of to justify his decision to Asmo, whether or not they were true. Once a lawsuit was filed and Keane knew the reasons would be subject to scrutiny, it changed the justifications … to include only those that

were either circumstantially true or could not be as easily penetrated as false.

*Id.* at 596.

Plaintiff argues that Defendants initial reason for removing Riverside was that her sales were low, and offers evidence disputing Defendants' statistics. (Pl.'s Memo. in Opp. at 78-82). Plaintiff then argues that Defendants shifted their reasons to remove Riverside because her territory was geographically too large and the final reason given was because Plaintiff was dangerous.

Defendants maintain, however, that the main reason for removing the Riverside account from Plaintiff and Mr. Giacobbe, regardless of the conflicting statistics, was because of low sales in the account. Defendants do not dispute that during the February 20, 2008 telephone conversation between Plaintiff, Mr. Suppes, and the HR Manager, Mr. Suppes noted that Plaintiff's territory may have been too large for her to concentrate on the Riverside doctors and Dr. Noble. However, Suppes then reiterated that the reason for removing Riverside was because of the sales performance in the account. At no time did Suppes say sales performance was not the reason for the removal, nor did the reasoning change. (*See* Grubiak Decl. Ex A, Disc 2).

Similarly, with respect to the dangerous comment, Mr. Suppes mentioned during a conversation with Plaintiff that the lab manager indicated that Plaintiff was dangerous. Despite Plaintiff's argument that this was the reason she was removed from Riverside, Suppes did not actually say that. Instead, he maintained that she was removed because of low sales.

While Plaintiff does raise some questions regarding St. Jude's sales data, Plaintiff cannot show that St. Jude's reliance on that data to remove both her and Mr. Giacobbe from the Riverside account was a result of race and/or sex discrimination. Plaintiff may disagree with St. Jude's business practices, but it has the right to use those practices as long as they are not discriminatory. *See*

34

*Haynes v. Northrop Grumman Mission Systems*, 2007 U.S. Dist. LEXIS 67032 (S.D. Ohio 2007) (Rice, J.) ("This Court and the Sixth Circuit have recognized that a plaintiff cannot establish pretext in an age discrimination case simply by questioning the soundness of the employer's business practices."). Further, there is no evidence that Defendants did not honestly believe in the statistics in making their decision to remove Riverside from Plaintiff and Mr. Giacobbe's territories. *See Braithwaite v. Timken Company*, 258 F.3d 488, 493 (6th Cir. 2001) (to show pretext, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action."). Further, any inconsistencies in the sales on the spreadsheets applied equally to Plaintiff and Mr. Giacobbe; therefore, Plaintiff's attempt to show pretext by arguing that the numbers were somehow manipulated to show low sales for her fails. Accordingly, Plaintiff cannot prove that Defendants' proffered reason for removing Riverside from her sales territory–low sales–had no basis in fact, did not actually motivate Defendants' challenged conduct, or was insufficient to motivate Defendants' challenged conduct. *Wexler*, 317 F.3d at 576; *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Defendants are therefore entitled to judgment on this claim.

### (b) Plaintiff's 2008 Performance Evaluation

Plaintiff Jones claims that Defendants discriminated against her based on her race and sex when she was given a "2" (below expectations) on her 2008 performance evaluation. Defendants argue that Plaintiff cannot maintain a disparate treatment claim because: (1) Plaintiff cannot produce evidence demonstrating that the 2008 performance evaluation constitutes a "materially adverse employment action"; and (2) Plaintiff fails to identify similarly situated persons outside the protected class who were treated more favorably.

###### i.     Adverse Action

Plaintiff asserts that downgrading her performance evaluation was an adverse employment action because it prevented her from being assigned a new EP and Defendants used it to "build up her file" in anticipation of her termination.  (Pl.'s Memo. in Opp. at 60).  Defendants counter that Plaintiff's performance evaluation had no effect on Plaintiff's wages or salary and therefore cannot rise to the level of an adverse employment action.  (Defs.' Mot. at 31). The Court agrees with Defendants.

To constitute an adverse employment action, such action must result in a materially adverse change in the terms and conditions of the plaintiff's employment, such as a decrease in wage or salary. *Love v. Elec. Power Bd. of Chattanooga*, 392 Fed. App'x 405, 408 (6th Cir. 2010); *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999).  In *Hollins*, the Sixth Circuit concluded that the plaintiff had not suffered an adverse employment action because she was unable to demonstrate that the "lowered performance ratings actually had an effect on her wages such that a court may conclude that there was a materially adverse employment action." 188 F.3d at 662-63.  *See also Tuttle v. Metro Gov't*, 474 F.3d 307, 322 (6th Cir. 2007) ("a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary").

Likewise, in *Primes*, the Court rejected the plaintiff's argument that his low evaluation constituted an adverse action. 190 F.3d at 767.  The *Primes* Court explained:

If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure. Paranoia in the workplace would replace the prima facie case as the basis for a Title VII cause of action. The case law supports our view that the employer conduct in this case will not support a Title VII cause of action. *See Yates v. Avco,* 819 F.2d 630, 638 (6th Cir. 1987) (plaintiff did not suffer adverse employment action, where demotion was in response to request for a transfer away from a harassing supervisor, salary and benefits were not reduced, and employee was assured that she would receive the next available position at higher grade); *Sweeney v. West,* 149 F.3d 550, 557 (7th Cir. 1998) (if negative performance evaluation were deemed actionable as "retaliation," it would "send a message to employers that the slightest nudge or admonition ... can be the subject of a federal lawsuit"); *Rabinovitz v. Pena,* 89 F.3d 482, 488-89 (7th Cir. 1996) (low performance evaluation and consequent ineligibility for discretionary bonus not actionable adverse employment action); *Montandon v. Farmland Industries, Inc.,* 116 F.3d 355, 359 (8th Cir.1997) (lower performance evaluation not used as basis for any action against employee not "adverse employment action"); *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994) (same).

*Id.*

Applying the foregoing case law to the instant case, the Court finds that Plaintiff's 2008 performance evaluation is not the type of adverse employment action contemplated by Title VII. The Court is unpersuaded by Plaintiff's unsupported speculation that as a result of receiving a "2" on her performance evaluation, Dr. Migeed was not assigned to her account and she was selected for the RIF. First, with respect to Dr. Migeed, Plaintiff attempts to use a St. Jude policy that evaluations may be used when an employee is applying for a position in another part of the organization to apply for the assignment of an account. However, the assignment of a doctor is a unilateral right of St. Jude under the employees' contracts. (See Jones Dep. at 72, Ex. 4). Plaintiff has therefore failed to establish that her performance review was used in deciding where to assign Dr. Migeed.

Likewise, Plaintiff has not produced any evidence linking her performance evaluation to her selection for the RIF. Mr. Moore testified that in identifying candidates for the RIF in August of 2009, he looked to the employees' sales during the prior year. The sales data that Mr. Moore

examined (August 2008-August 2009) was not even the same sales data that resulted in the 2008 evaluation ratings (January 2008-December 2008).  There is no evidence that Mr. Moore looked to anyone's performance evaluation rating to select employees for the RIF.  Accordingly, the Court concludes that Plaintiff cannot state a *prima facie* case of discrimination with respect to the negative performance evaluation.

### ii.  Similarly Situated

Even if Plaintiff's 2008 performance evaluation constituted an adverse action, Defendants argue that Plaintiff cannot establish that she was treated less favorably than similarly situated employees outside of her protected class.  Plaintiff asserts that no other sales representatives in Columbus had their performance scrutinized as closely as she did.  Plaintiff was given her performance evaluation weeks after all the other male sales representatives and her evaluation was the only one that received input from both Moore and Valle.  (Jones Dep. at 208-10).  Further, Plaintiff seems to suggest that she should be compared to all the other sales representatives without regard to the difference in their sales numbers.

The Sixth Circuit has instructed that in determining whether the plaintiff was treated less favorably than other "similarly-situated" employees, courts should look to whether the allegedly comparable employees have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  Therefore, in this case, applying *Mitchell*, to determine whether Plaintiff was similarly situated to the other sales representatives, the Court must look to the behavior (their sales during 2008) that led to the employer treatment at issue (the issuance of the performance evaluations).

38

Defendants assert that employees who are similarly situated to Plaintiff are those with similar sales performance.  Defendants reference *Tiller v. Immke Auto Group, Inc*., 2007 U.S. Dist. LEXIS 31136, at *28 (S.D. Ohio 2007), where an employment decision was based on sales performance, "the individuals who are similarly situated in all relevant aspects are the other . . . sales representatives who had sales performance similar to that of Plaintiff."  Plaintiff argues that *Tiller* is not on point because the sales people in that case sold cars from the same lot to the same potential customers, and were all judged against the same account.  She asserts that the sales performances in *Tiller* could be judged against one another, but such comparison cannot be made in this case.  (Pl.'s Memo. in Opp. at 69).  Plaintiff does acknowledge that "Tiller would only be applicable to this case had Defendants measured Jones' performance and the other representatives' sales performances after adjustments for territory size, the number of representatives assigned to each territory, and market potential."  (Pl.'s Memo. in Opp. at 70).

However, Defendants argue and the Court agrees that St. Jude did adjust for territory size and market potential in the performance evaluations by focusing not only on raw sales totals but also on market share.  Plaintiff's performance evaluation states: "Chyrianne needs to focus her efforts more.  She produced $247,000.00 in 2008 in a Territory that has a Market potential of $5 to $7 Million dollars.  This is below expectations for her territory."  (Pl.'s Memo. in Opp. Ex. 49).

Plaintiff has not identified any other active sales representative whose raw sales numbers or market share was as low as hers and who received a higher performance rating.  Plaintiff does reference sales representative Erich Stohr, who had no sales activity during calendar year 2008 and received a performance rating of "4".  However, it is undisputed that Mr. Stohr was a new hire who was subject to a noncompetition agreement and therefore restricted from selling.  Mr. Stohr was not

even assigned any sales territory during the first year of his employment agreement, which ran from May 2008 through May 2009. (Ellen Dep. at 217-18). For this additional reason, the Court concludes that Plaintiff cannot state a *prima facie* case of discrimination with respect to the negative performance evaluation.

### iii. Pretext

Finally, even if Plaintiff could set forth a *prima facie* case with respect to her claim for disparate treatment based upon the 2008 performance evaluation, Defendants would still be entitled to judgment on this claim because Plaintiff has not met her burden to demonstrate that Defendant's legitimate proffered reason for giving her the "2" rating is a pretext for discrimination. Plaintiff argues again that Defendants' calculations of her 2008 sales are erroneous. However, Defendants argue that even construing all the sales in Plaintiff's favor, she still had the lowest sales of any sales representative in the Columbus region.

Accordingly, Plaintiff cannot maintain that Defendants' determination that her sales performance was "below expectations" was false and that discrimination really motivated her performance evaluation.

### (c) Removing Dr. Noble from Plaintiff's Sales Territory

Plaintiff asserts that Defendants discriminated against her based on race and sex by removing Dr. Charles Noble from her sales territory in June 2009. Defendants argue that Plaintiff cannot establish a *prima facie* case of discrimination because she cannot show that she was treated differently from similarly situated employees outside of the protected class. Moreover, Defendants argue that even if a *prima facie* case is made, Plaintiff cannot demonstrate that their legitimate, non-discriminatory reason is a pretext for discrimination. Defendants assert and Plaintiff acknowledged

40

that Defendants removed the Dr. Noble account from Mr. McQuarrie and Mr. Woyton, who are both Caucasian males and gave it to Plaintiff–just as the account was taken from Plaintiff and given to Mr. Major.  Further, when the Dr. Noble account was taken from Plaintiff, it was reassigned to an African-American man, demonstrating that the account was reassigned without regard to race.

###         i.         Similarly Situated

Plaintiff makes a conclusory statement that she has set forth a *prima facie* case because Defendants removed the Dr. Noble account from her and gave it directly to a male, Major.  Plaintiff argues that Defendants' argument regarding the account previously being removed from two white males and given to Plaintiff fails because the proper inquiry is not who preceded Plaintiff, but rather, who succeeded her, citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). Additionally, Plaintiff argues that McQuarrie and Woyton were removed from Dr. Noble's account because "Dr. Noble expressed to [Major] on numerous occasions that he did not want to work with those individuals." (Major Dep. at 161-62).  Whereas Plaintiff was not removed from Dr. Noble's account because he did not like her, rather, Dr. Noble testified that "Chyrianne Jones is a capable, enthusiastic, and personable sales representative.  She was reliable and responsive.  I found her technically proficient and highly qualified."  (Noble Aff., Pl.'s Memo. in Opp. Ex. 20).  Finally, Plaintiff argues that when Dr. Noble was removed from Woyton and McQuarrie, he was replaced with another EP, Dr. Nelson at Riverside, yet Plaintiff was not given another EP to replace Dr. Noble.


Defendants argue in response that the *McDonnell Douglas* Court noted that "the facts necessarily will vary in Title VII cases, and the specification above of the *prima facie* proof required from respondent is not necessarily applicable in every respect to differing factual situations."  411

U.S. at 802. Further, there is no requirement that in determining whether Plaintiff has set forth a *prima facie* case that the Court must only look to who replaced her in the account.

Not only was Plaintiff not treated any differently than similarly situated male sales representatives who each had Dr. Noble's account taken from their territory, but when Dr. Noble was removed from Plaintiff, he was reassigned to Major, an African-American. Accordingly, the Court finds that Plaintiff cannot establish a *prima facie* case of race and/or sex discrimination due to the reassignment of the Dr. Noble account.

### ii. Pretext

Even if Plaintiff can establish a *prima facie* case of discrimination with respect to the removal of Dr. Noble account from her sales territory, she cannot establish that Defendants' legitimate, non-discriminatory justification for the removal is pretextual. St. Jude has stated that it removed the Dr. Noble account from Plaintiff because of her failure to make sufficient sales transactions in the account. (Ellen Dep. at 281-82). Plaintiff's market share in the Dr. Noble account was .04% in 2008 and .015% in 2009.

Plaintiff herself produced the affidavit of Dr. Noble that corroborates the fact that Plaintiff had not been able to make much traction with his sales. Dr. Noble acknowledged that Plaintiff had been his sales representative for two years and that he still preferred a competitor's devices over St. Jude's products. Moreover, he indicated that "nor do I foresee my allocation of sales being altered in the future." (Noble Aff. ¶¶ 2, 5).

Plaintiff argues that Defendants' reasons for the removal are pretextual because it is not credible to believe that Major would have more success as the sales representative to Dr. Noble. Defendants knew prior to Plaintiff being assigned to Dr. Noble that he had done very little business

42

with St. Jude.  Further, Plaintiff asserts that the statement that she was not making traction is not credible because she was on FMLA leave for three months and no adjustment was made to her sales goals.

Plaintiff is essentially arguing that it is unreasonable to believe that another sales representative could improve the sales in Dr. Noble's account.  Plaintiff cites to *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998), in arguing that Defendants' reasons are "so unreasonable they are not worthy of credence."  (Pl.'s Memo. in Opp. at 88-89).  In *Smith*, the Sixth Circuit analyzed how a plaintiff may show that an employer's "honestly held" reasons for its decision are pretextual.  155 F.3d at 807-08.  Under the honest belief rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made.  *Smith*, 155 F.3d at 806-07; *see also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).  As applied to the instant case, Defendants have demonstrated that they reasonably relied on their belief that Plaintiff's sales with Dr. Noble were not strong.  Plaintiff has failed to produce any evidence to the contrary. Plaintiff's repeated argument that Dr. Noble was loyal to another brand does not excuse her sales, nor is it unreasonable for Defendants to want to try to increase their sales with Dr. Noble.  Further, Mr. Major had a prior relationship with Dr. Noble and it was not unreasonable for Defendants to believe that he might have more success in increasing sales to Dr. Noble.

Plaintiff also makes reference to her FMLA leave in the spring of 2008.  Her leave ended on May 25, 2008, more than one year before the Dr. Noble account was removed in June of 2009. Defendants argue that Plaintiff's 2009 market share was actually worse than her 2008 market share and that she received credit for all sales in her territory while she was on leave.

Accordingly, the Court finds that Plaintiff cannot prove that Defendants' reasons for removing the Dr. Noble account from her territory was pretextual. Defendants are therefore entitled to judgment on this disparate treatment claim.

**(e)      Plaintiff's Termination**

Plaintiff alleges that Defendants discriminated against her on the basis of her sex and her race by selecting her for termination through the RIF, placing her on the PIP, and terminating her employment on December 11, 2009. Defendants argue that Plaintiff cannot establish a *prima facie* case because she was not treated less favorably than any similarly situated employee outside of the protected classes with respect to her termination. Further, Defendants have articulated two separate legitimate, non-discriminatory reasons for Plaintiff's termination: (1) Plaintiff admittedly tape-recorded managers and customers of St. Jude without their consent; and (2) Plaintiff admittedly failed to meet the minimum sales requirements of her performance improvement plan ("PIP").

**i.      Similarly Situated**

In August 2009, St. Jude underwent a nationwide reduction-in-force. As part of this RIF, three employees from the Columbus region were selected. Defendants assert that the three employees were: Plaintiff, Hal Ellen, and Andrew Fitzpatrick. However, Plaintiff asserts that the three people to be terminated as part of St. Jude's RIF were Chris Webb (a white, male associate sales representative); Andrew Fitzpatrick (a white, male TSS); and Plaintiff Jones (an African-American, female sales representative). Defendants assert that employees who were selected for the RIF were terminated immediately if they were at-will employees, such as Hal Ellen. Those employees that had term of years agreements were given the option of electing a severance payment or being placed on a PIP. Nationwide, only three employees chose to be placed on a PIP: Plaintiff, Kenneth Kupfrian

44

and John Dalton (both Caucasian males).  Among that group, Mr. Dalton did not meet the requirements of his PIP and was terminated in October of 2009.  Defendants assert that there were no individuals outside of Plaintiff's protected classes who failed to meet the requirements of the PIP and who were not terminated.  Additionally, Defendants argue that there were no employees outside of Plaintiff's protected classes who violated St. Jude's tape recording policy and who were not terminated.

Plaintiff argues that the other two selected for the RIF, Webb and Fitzpatrick, were not placed on a PIP or terminated.  And that Ellen, the only other individual terminated as part of the RIF, was rehired within two weeks of his termination.  Further, Plaintiff argues that not only was she "treated differently than her similarly situated male counterparts, she was replaced by Antol, a white male, outside her protected classes."  (Pl.'s Memo. in Opp. at 74).

As noted above, to be deemed "similarly situated," the comparable employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell*, 964 F.2d at 583.  Despite some confusion on who was actually selected for the RIF, there were other similarly situated employees outside of Plaintiff's protected classes that were also selected for the RIF.  With respect to the PIP, there was one other employee, Mr. Dalton, who was a Caucasian male, therefore outside of Plaintiff's protected classes, who did not meet the requirements of his PIP and was terminated in October of 2009.  Accordingly, Plaintiff has failed to set forth a *prima facie* case of race and/or sex discrimination in her termination.

45

ii.      **Pretext**

Defendants have articulated two separate legitimate, non-discriminatory reasons for Plaintiff's termination: (1) Plaintiff failed to meet the minimum sales requirements of her performance improvement plan ("PIP"); and (2) Plaintiff tape-recorded managers and customers of St. Jude without their consent. Plaintiff argues that these reasons are not credible for the following reasons: (1) she was pre-selected for participation in the RIF based on her race and gender; (2) Defendants' RIF disproportionately affected African-Americans; (3) 100% of African-Americans who have worked for Moore have been demoted, fired, or both; (4) Defendants condone discrimination in the workplace; (5) her PIP was unattainable; and (6) Defendants failed to terminate Plaintiff on the basis of the tape recordings for several months. The Court will address each of Plaintiff's arguments in turn.

First, there is no evidence, other than Plaintiff's conclusory allegation, that she was pre-selected for participation in the RIF based on her race and gender. Plaintiff's repeated arguments that Defendants' sales information was inaccurate does not establish pretext. As this Court has previously stated, even construing the sales in Plaintiff's favor, she still was not meeting the sales expectations of St. Jude. The Sixth Circuit has found that "numerous charges of disparate treatment and hostile work environment that are made in general, conclusory terms, but [in which] names times and occasions are missing" did not demonstrate pretext. *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 171 (6th Cir. 1996).

Second, Plaintiff argues that St. Jude's RIF disproportionately affected African-Americans and references statistics, including that 31% of African-Americans were terminated while only 12% of the white workforce were terminated in the RIF. Defendants, however, argue that these statistics

are simply raw data presented in a format that best suits Plaintiff's desired result and argument. Defendants assert that Plaintiff's argument is flawed because she acknowledges that African-Americans and females were underrepresented in St. Jude's workforce, but fails to recognize that the layoff of any single African-American or female employee would result in a higher percentage of per employee terminated than if a white or male were terminated.

In order for statistics to be probative, they must have both a "methodology and explanatory power" that is "sufficient to permit an inference of discrimination." *Allen-Cuffee v. Franklin County Juvenile Detention Center*, 2001 U.S. Dist. LEXIS 4754 (S.D. Ohio 2011) (Marbley, J.). The plaintiff in *Allen-Cuffee* brought a claim of race discrimination when her employment was terminated. In an attempt to establish pretext, the plaintiff presented the following:

> The Plaintiff also offers the following "statistical" evidence. In 1998, approximately forty-two disciplinary hearings were held. Twenty-eight out of the forty-two were black employees. Out of the fourteen white employees who were sent to a disciplinary hearing, only five were in the Unit Life Department under Mr. Kise. The disciplines for the white employees were: written reprimand, postponed charges and a one-day suspension. Of the twenty-eight blacks sent to disciplinary hearings, twenty were from Mr. Kise's Unit Life and the disciplines included four terminations.
>
> From November 1, 1997 to late 1998, Mr. Kise was the recommending supervisor for twenty-four disciplines. Out of the twenty-four recommended disciplines, only five of those employees were white. None of those white employees were recommended for termination, nor were they terminated.

The defendant in *Allen-Cuffee*, like Defendants in the case at bar, argued that the statistics were improper and the Court agreed. The Sixth Circuit has found that the "both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 524 (6th Cir. 1997). Statistics have failed when they have, for example, offered too small a sample size, when information on the methodology is missing and when the source of the data is absent. *Id.*; *see also Martinez v. State of*

*Wyoming*, 218 F.3d 1133 (10th Cir. 2000) (concluding that the statistics provided did not raise a genuine issue of material fact because, for one, they did not "eliminate nondiscriminatory explanations for the disparate treatment"); *Raskin v. The Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997) (finding that a statistical report lacked probative value as it did not "account for other possible causes," and did not "account for the presence of a comparison groups."); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848-49 (1st Cir. 1993) (reaching the conclusion that the statistics were of "questionable import" for several reasons including that they did not "connect the statistics to the [defendant's] specific decision to dismiss [the plaintiff;]" "did not provide important information regarding the pool of applicants;" and did not "eliminate nondiscriminatory explanations for disparate treatment").

The Court, like in *Allen-Cuffee*, finds that Plaintiff's alleged statistics on St. Jude's RIF are flawed and irrelevant to whether Plaintiff's specific adverse employment actions were discriminatory. Further, Plaintiff had not ruled out any non-discriminatory reasons for the composition of the RIF.

Plaintiff's third and fourth pretext arguments are that every African-American that has worked for Moore, including Major, Plaintiff, Jerry Hudson, and Kevin Beal, were demoted, fired, or both, and Defendants tolerate and condone discriminatory conduct against blacks and females.  In support of these arguments, Plaintiff relies on the testimony of Jerry Hudson who claims that he was discriminated against when his employment as a regional manager with St. Jude was terminated. Plaintiff also relies on Major's allegations that Moore discriminated against him based on his race when he demoted Major from regional manager to sales representative.  Plaintiff is essentially arguing that these claims of discrimination substantiate her own.

Defendants argue that these other claims of discrimination are not related to Plaintiff and would be their own trial-within-a-trial.  Further, Defendants argue that this alleged "me too" evidence

is not admissible. With respect to Hudson, he was a regional manager in the Cleveland area who was terminated before Plaintiff even came to Columbus. Additionally, in a lawsuit filed by Hudson against St. Jude, he claims that his employment was terminated in violation of the Federal False Claims Act because he refused to participate in allegedly unethical and unlawful practices. At no time had Hudson alleged race discrimination. (Case No.: 1:06-cv-2152 (N.D. Ohio)). Then, within six months of settling that lawsuit, Hudson signed an affidavit in this case claiming for the first time that his termination was a result of race discrimination. With respect to Major, he was also a regional manager whose region was underperforming all 62 other St. Judge regions and he chose to be re-assigned to a sale representative rather than be placed on a PIP.

The Sixth Circuit has held that "me too" evidence, which is defined as claims by a plaintiff's co-workers that they too were discriminated against, is unwelcome because it is at best only slightly relevant and is always highly prejudicial to the defendant. *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988). "Me too" evidence is typically inadmissible under Rule 403 of the Federal Rules of Evidence because it prejudices the defendant by embellishing the plaintiff's own evidence of alleged discrimination and typically confusing the issue of whether the plaintiff, and not others, was discriminated against. *Schrand*, 851 F.2d at 156; *Johnson v. Interstate Brands Corp.*, 351 Fed. App'x 36, 41 (6th Cir. 2009) (citing *Schrand* and nothing that "trial courts regularly prohibit 'me too' evidence from or about other employees who claim discriminatory treatment because it is highly prejudicial and only slightly relevant."). The only exception is where the plaintiff can show that her "me too" evidence is logically and reasonably tied to her specific adverse employment actions because the same actors, reasons, and circumstances were involved. *Geiger v. Pfizer, Inc.*, 2009 U.S. Dist. LEXIS 34982 (S.D. Ohio April 15, 2009) (Marbley, J.).

Consistent with the aforementioned caselaw, Plaintiff's purported evidence of alleged discrimination against Hudson and Major is inadmissible and therefore cannot create a genuine issue of material fact on summary judgment. The opinions and beliefs of Hudson and Major are just that, subjective beliefs that are irrelevant and highly prejudicial, and not evidence of pretext. *See Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) ("It is well settled that '[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of discrimination.'"). Further, Hudson and Major's employment actions are not related to Plaintiff's claims because they do not involved the same actions, reasons and circumstances. *See Schrand*, 851 F.2d at 156.

Plaintiff also offers alleged discriminatory comments as evidence of pretext, including one comment which was said in her presence and many others that were overheard by Major when he was working for St. Jude in Buffalo, New York, before Plaintiff was even employed by St. Jude. The comment Plaintiff heard was in a team meeting where Major stated that he was a hockey player and Suppes asked, "Oh, were you the puck?" (Major. Dep. at 210). The other comments heard by Major include: one St. Jude employee calling a black employee "Aunt Jemima" and saying, "Go in the back and make some pancakes" (Major Dep. at 212); senior management employees making comments to black employees such as, "If you want to golf, you can come carry my golf clubs if you want to be on the course," and "The meeting is over. Go get my car" (Major Dep. at 214); and a black, female employee called a "n-gger b-tch." (Major Dep. at 214, 216).

Defendants argue that these comments are irrelevant, prejudicial, inadmissible and do not create an issue of fact. These comments were never made by any decision maker on any of Plaintiff's adverse employment actions. Both Plaintiff and Major testified that their supervisor, Moore, never

made any discriminatory comments.  (Major Dep. at 216; Jones Dep. at 267-69).  Therefore,

"statements by nondecisionmakers, or statements by decision makers unrelated to the decisional

process itself, [cannot] suffice to satisfy the plaintiff's burden. . . of demonstrating animus."  *Bush*

*v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998).  Additionally, with the exception of the

hockey puck comment, Plaintiff was not even aware of the other comments while she was employed

with St. Jude and only learned about them during the course of the litigation.  The Sixth Circuit has

held, in the context of a hostile work environment claim, that a plaintiff must at a minimum be aware

of comments allegedly indicating discriminatory intent for such comments to be relevant and

admissible.  *Fuelling v. New Vision Med. Labs*, LLC, 284 Fed. App'x 247, 259 (6th Cir. 2008).

Finally, while the comments heard by Major are concerning, they cannot create an issue of fact on

Plaintiff's disparate treatment claim because none of the comments were relevant to the decision-

making process on Plaintiff's adverse employment actions.

       Fifth, Plaintiff argues that her termination based on her failure to meet the requirements of her

PIP is pretext because Defendants ensured that she could not succeed on her PIP.  Plaintiff was

placed on a PIP on August 18, 2009.  As the basis for the PIP, Moore claimed that: (1) Jones was

not achieving the expected sales results for her assigned territory; and (2) she "refused" to work with

Major and share sales commissions with Major on Dr. Noble's account.  Plaintiff argues that both

reasons are inaccurate.

       Plaintiff's PIP stated that she should have been meeting the corporate metric of $1.2 to $1.5

million in sales for her territory.  Yet, Major, the former RSM for the region and the sales

representative who replaced Jones in most of her accounts, testified that Jones' territory could not

generate $1.2 million dollars in sales.  Furthermore, in her PIP, Moore set a sales quota for Jones of

51

12 LV units per month, contending that the market potential in her territory was 405 units per year (roughly 34 units per month).  In setting this sales goal, Moore used the market potential for the entire hospitals identified in Jones' contract, even though he knew Jones' sales territory included only certain, limited physicians at each hospital.  Jones had only four low voltage

implanting cardiologists in her contract at the time she was put on her PIP.  According to Major's testimony, these four cardiologists only implanted a total of 160 units a year, not the 405 units per year claimed by Moore.  (Major Dep. at 252-253).  In addition to overstating the local market potential of Jones' sales territory, the sales quota Moore set for Jones required that she exceed St. Jude's national market share. Ellen testified that St. Jude's national market share is 28%, while Moore testified that St. Jude's national market share was 35%. (Ellen Dep., 138; Moore Dep., 268–69). Even assuming Moore's 35% is accurate, in Jones' territory she would only be required to sell 5 units per month to meet St. Jude's national market share.  Yet, St. Jude and Moore expected Jones to sell 12 units per month. (*See* Jones Memo. in Opp. Ex. 58). Thus, Plaintiff contends that Defendants' PIP demanded that Jones corner 90% of the market in

her territory to avoid being terminated. (See Major Dep. at 254).

Plaintiff argues that Moore further impaired Jones' ability to meet the sales goals in her PIP by refusing to add to Jones' sales a number of units she sold to physicians "not in her contract," although those doctors worked in the hospitals she called upon.  (Moore Dep. at 277). Moore also changed the period over which Jones' monthly performance was measured. (Jones Memo. in Opp. Ex. 63).  By doing so, Plaintiff claims that she lost credit for some of her sales.  In conclusion, Plaintiff argues that Moore acted consistent with his past practices in dealing with employees of color.

Defendants argue that Plaintiff has failed to show that her failure to meet the requirements of her PIP was a pretext for her termination. Defendants assert that Plaintiff's attack on St. Jude's methodology for setting the PIP expectation numbers fails as a matter of law and the Court agrees.

The Sixth Circuit has adopted the "honest belief" rule with regard to an employer's proffered reason for discharging an employee. Under this rule:

> as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made.

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citations and internal quotations omitted). As this Court has also noted:

> In order to demonstrate pretext, a "plaintiff must produce sufficient evidence from which the jury could 'reasonably reject [the defendants'] explanation' and infer that the defendants 'intentionally discriminated' against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.2001), citing *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246-47 (6th Cir.1997) (citations omitted). Further, in order to establish pretext, "the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite*, 258 F.3d at 493-94 (citing *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir.1998) (citation omitted)).

*Allen v. Ohio Dep't of Job & Family Servs.*, 697 F. Supp. 2d 854, 893 (S.D. Ohio 2010) (Smith, J.).

Where a plaintiff is terminated for poor performance for failure to meet sales goals, the courts' "only concern at the pretext stage is whether this defendant honestly remained dissatisfied with its employee's performance." *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001). In *Olsen*, the employer terminated the plaintiff for poor performance because "for the majority of his

53

tenure as Mauston branch manager, Olsen consistently failed to meet his personal sales goals." *Id.*
at 601.  The plaintiff pointed out that his performance had improved greatly in the month preceding
his termination, during which he met 100% of his sales goals.  *Id.*  The court was unmoved,
explaining:

> Mid-State was free to determine that, based on this history, Olsen's one month of
> improved performance was not an indication that he would continue to meet its
> expectations. In Mid-State's view, "one month of sales does not make a salesman,"
> and we are not authorized by Title VII to impose upon the employer a contrary
> assessment.

*Id.* at 602.  The court continued:

> Olsen may be correct in suggesting that one month of exceptional performance
> would allay the average employer's performance concerns, but we are not concerned
> with the average employer. Our only concern at the pretext stage is whether this
> defendant honestly remained dissatisfied with its employee's performance. And Olsen
> has not presented any evidence that would cause a reasonable factfinder to question
> whether Mid-State honestly believed its assessment.

*Id.* (citation omitted).  In making this determination, "it is not enough for a plaintiff to show that his
employer's explanation was based on an inaccurate assessment of its employee's performance."  *Id.*
A plaintiff cannot attack an employer's justification by presenting evidence of her own positive
perception of her performance based on an argument that the employer incorrectly assessed it.  The
*Olsen* court cited to *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir.1998),
and noted:

> The plaintiff in *Adreani* pointed to his own positive perception of his performance
> in an attempt to create a genuine issue of material fact as to pretext. We rejected
> his attempt, noting that (even assuming that an employee's perception of his own
> performance can be considered objective evidence of his abilities) evidence that
> shows that an employer incorrectly assessed its employee's abilities does not shed
> light on whether the employer is lying about that assessment. And without proof
> of a lie, no inference of discriminatory motive can be drawn.
> Olsen, like the plaintiff in *Adreani*, has placed his own assessment of his abilities
> adjacent to his employer's and asked us to draw from the apparent incongruity the

> inference that his employer is lying. An employee's perception of his own
> performance, however, cannot tell a reasonable factfinder something about what
> the employer believed about the employee's abilities.

*Id.* (internal citations omitted).  In sum, "The court's role is not to determine whether [the employer's] decision was right, but whether [the employee] presented sufficient evidence that [the employer's] reason was a lie for the action it took." *Id.* (internal quotation omitted). Accordingly, the court in *Olsen* rejected the plaintiff's argument that the poor-performance rationale was pretext. *Id.*

In the case at bar, it is undisputed that Defendants relied on particularized data in determining what would be a reasonable expectation for Plaintiff's sales in her particular territory.  Specifically, the undisputed evidence is that St. Jude established the number of units Plaintiff was expected to sell based on market data that it purchased from a third party vendor that tabulates Medicare implants. (Moore Dep. at 268-72; Moore Dec. ¶ 41).  This data suggested that total implants in Plaintiff's sales territory amounted to 405 devices per year. (Moore Dep. at 268).  Based on that data, St. Jude required Plaintiff to sell 12 low-voltage devices per month to achieve the desired market share of approximately 36% (which Moore believed was lower than St. Jude's national market share for low-voltage CRM implants). (Moore Dep. 268-69).  Plaintiff has produced no evidence that St. Jude did not use the data that it received from the third-party vendor to set its expectations for Plaintiff. Moreover, Plaintiff has presented no evidence that St. Jude did not use data from that same source and the same methodology to set the sales expectations for its other sales representatives outside of her protected classes.  Instead, Plaintiff tries to use extrinsic data that St. Jude was not aware of at the time to show that St. Jude's estimation of the total implants in her territory was incorrect.  This data includes former manager Lou Major's opinion about the sales potential of her territory based on

his observations, and information subpoenaed from hospitals serviced by Plaintiff. Further, Plaintiff's argument that the PIP was unrealistic because St. Jude removed all her EPs also fails because the PIP did not require her to sell any high voltage devices–the type of devices implanted by EPs.

The "honest belief" inquiry focuses on the employer's reliance on the particularized facts "that were before it at the time the decision was made." *Majewski*, 274 F.3d at 1117. Because the undisputed evidence shows that St. Jude used objective, third-party data to set the expectations for Plaintiff's PIP, and there is no evidence that other employee expectations were set using different data, Plaintiff's claim that her termination for failure to meet the sales expectations in her PIP was pretextual fails as a matter of law.

Finally, Plaintiff argues that Defendants' reason for terminating her–recording her conversations with St. Jude employees and customers in violation of St. Jude policy–is pretext for three reasons: (1) based on a finding of pretext based on St. Jude's other reason–failure to meet the minimum sales requirements of her PIP; (2) because of the lapse of time between Defendants' knowledge of the recordings and Plaintiff's termination; and (3) even if her tape recordings are grounds for termination, her behavior should be forgiven because she was forced to make the recordings to preserve evidence.

Defendants, however, argue that Plaintiff was terminated because she violated St. Jude's policy when she recorded conversations with customers and managers without their permission. Specifically, St. Jude's Code of Business Conduct provides that:

> No employee may tape record (or otherwise preserve) a telephone conversation or other conversation unless all persons who are being recorded are informed of the recording and explicitly consent to the recording in a manner that is preserved in the recording. . . .

(Grubiak Dec. ¶ 12). In addition, St. Jude's Employee Handbook expressly provides that conduct

that is unacceptable and that can lead to discipline up to and including termination includes:

> Recording, by . . . audio . . . any conversations . . . while on company premises or while performing Company business without the knowledge and consent of all parties to the communication and without obtaining the prior approval of the acting employee's manager and Human Resources.

(Grubiak Dec. ¶13).

Despite the aforementioned language and Plaintiff's admitted violation of the policy, she still argues that St. Jude's termination for this reason was pretextual. To show that an articulated reason for an adverse employment action is pretextual, Plaintiff must show that: (1) the reason had no basis in fact; (2) the reason was insufficient to motivate the action; or (3) the reason did not actually motivate the action. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471-72 (6th Cir. 2002). Plaintiff cannot show that the reason had no basis in fact because she admits that she tape recorded multiple St. Jude customers and managers, and that she did so without their permission. (Jones Dep. at 128-43). Likewise, Plaintiff cannot show that the reason was insufficient to motivate her termination, because she admits that St. Jude's policy expressly provides that tape recording without permission is a terminable offense. Plaintiff is arguing the third pretext criterion, i.e., that her tape recordings did not actually motivate her termination.

First, Plaintiff argues that the Court should find that the tape recording justification for her termination is pretextual because of her attacks on St. Jude's other reason for terminating her–failing to meet the requirements of her PIP. Generally, the Sixth Circuit has held that when an employer offers more than one independent legitimate, non-disriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment. *Sims v. Cleveland*, 813 F.2d 790, 793 (6th Cir. 1987); *Burks v. Yellow Transp*., 258 Fed. App'x 867, 876 (6th Cir. 2008). The Sixth Circuit stated in *Sims*:

> [I]t is not merely the falsity or incorrectness of the articulated reason that gives rise to the conclusion of pretext. Rather, it is the resulting absence of legitimate explanation for the suspect employment decision that warrants the finding of discrimination. Where two or more alternative and independent legitimate, nondiscriminatory reasons are articulated by the defendant employer, the falsity or incorrectness of one may not impeach the credibility of the remaining articulated reason(s).

*Sims*, 813 F.2d at 793.

In *Sims*, the plaintiff, an attorney for the Veterans Administration, claimed that she was not promoted due to sex discrimination, and the employer "advanced two alternative, nondiscriminatory reasons for its promotion decision: (1) that Sims was not qualified due to her deficiency in the medical malpractice area; and (2) that the VA believed in good faith that Kraut [the man who got the job] was more qualified for the position due to his attitude and work habits." 813 F.2d at 793. The district court rejected the first reason, finding that both employees met the minimum qualifications for the position. *Id.* But, the district court nevertheless did not find that the second reason was pretextual. *Id.* On appeal, the question before the Sixth Circuit was whether the falsity of one alternative and independent nondiscriminatory reason mandates a finding that the other articulated reason is pretext for discriminatory conduct. *Id.* The Court held that "[t]he district court's rejection of the claim that Sims was unqualified for the promotion due to her alleged inability to handle medical malpractice cases does not impugn the VA's alternative nondiscriminatory reason that Kraut was promoted due to his 'hard work and dedication.'" *Id.* The Sixth Circuit concluded that despite finding that one of the two independent reasons for the plaintiff's termination was pretextual, "the district court properly applied the law in failing to find pretext."

The Sixth Circuit reaffirmed this rule in *Smith v. Chrysler*, 155 F.3d 799 (6th Cir. 1998). In *Smith*, the employer fired the employee for two reasons: (1) falsely stating on a driver's license

examination form that he was not narcoleptic, and (2) falsely stating on a self-administered medical

history form that he had never suffered from unusual tiredness or fatigue.  155 F.3d at 804, 808.  The

Sixth Circuit found that the second reason was pretextual because the employer's conclusion was not

based on any medical evidence.  *Id.* at 808.  However, the Sixth Circuit found that the first

reason—that the employee had lied about having narcolepsy—was not pretextual, because the

employer was in possession of statements from his doctor stating that he suffered from that disease.

*Id.*  The Sixth Circuit concluded that despite the fact that one of its two reasons for terminating the

employee was pretextual, the other reason was not affected, and affirmed summary judgment.  As the

Sixth Circuit stated:

> The doubt raised over Chrysler's second alternative justification for firing Smith
> does not translate into an inference that the true motivation behind Smith's discharge
> was his disability. The two justifications and the sources from which they were
> derived were separate in nature: one related to whether Smith suffered from
> narcolepsy, which was answered by reasonably relying on the opinions of Smith
> himself and his treating physician, while the other involved a more specific judgment
> on the disorder's particular symptoms that was based on the employer's own
> subjective opinion. Chrysler's misjudgment as to the latter does not drag down its
> more general and medically supported conclusion concerning the former. The district
> court therefore did not err in granting summary judgment in favor of Chrysler due to
> Smith's inability to show pretext.

*Id.* at 809.

Despite this well established Sixth Circuit precedence, Plaintiff argues that this Court should

find that the tape recording justification for her termination is pretextual because of her attacks on

St. Jude's other reason for terminating her—failing to meet the requirements of her PIP, relying on

a narrow exception to the general rule under which the two reasons proffered by the employer are

"so intertwined" that a finding that one is pretextual renders the other pretextual as well.  *Smith*, 155

F.3d at 809.  Plaintiff relies *May v. Pilot Travel Centers LLC*, 2007 U.S. Dist. LEXIS 484 (S.D. Ohio

2007) (Frost, J.), in which the employer's two reasons for the plaintiff's termination were uncovered in the same, "intertwined investigation" by the same manager. By contrast, in *Burks* and *Smith*, the Sixth Circuit noted the exception but did not find it applicable to the facts in those cases. *Burks*, 258 Fed. App'x at 876; *Smith*, 155 F.3d at 809.

In *May*, the plaintiff sued for wrongful termination under the FMLA. As part of the burden-shifting framework, the employer articulated two legitimate, non-discriminatory reasons for the termination: the plaintiff's "rolling" of invoices and his manipulation of overtime. *Id.* at *4. The Court noted that the overtime justification and the "rolling" invoice justification were part of the same investigation and noted that the overtime justification was included in the plaintiff's termination notice and had been articulated as a reason for the termination in the litigation, but had never actually been submitted to the HR manager as part of the termination decision-making process. *Id.* The court then considered "the question of whether one potentially pretextual reason undercuts another proffered reason." *Id.* at *5. It began by acknowledging the "case law holding that when an employer offers multiple reasons for discharging a plaintiff, that plaintiff must show that each reason was pretextual." *Id.* at *6. The court then noted the exception for cases in which the multiple reasons are "so intertwined" that the plaintiff could withstand summary judgment by showing the pretextual nature of just one reason. *Id.*

Applying those rules to the facts of the *May* case, the court concluded that because of the "intertwined investigation" behind the two articulated reasons, "the failure of the overtime justification calls into question the rolling invoices justification." *Id.* It is noteworthy, however, that the court also identified independent evidence that the rolling invoices justification was itself pretextual. *Id.* at *4-5. Despite all of these considerations, the court found that the *May* case "barely

qualifie[d] to demonstrate pretext." *Id.* at 8. (alteration in *May*).  Here, our facts are similar to the many Sixth Circuit cases applying the general rule, and do not fit into May's narrow exception. The undisputed evidence shows that St. Jude's two reasons for Plaintiff's termination were in no way "intertwined."

Unlike in *May*, Plaintiff's termination for tape recording customers and managers without their consent had nothing to do with Plaintiff's failure to meet the sales requirements of her PIP.  The two reasons did not come out of the same investigation.  In fact, it is undisputed that two different managers made the decisions to terminate Plaintiff for the different reasons. Mr. Grubiak made the decision to terminate Plaintiff for violating the tape recording policy, while Mr. Moore made the decision to terminate Plaintiff for failing to meet the requirements of her PIP.  (Grubiak Dec. ¶¶ 14-16; Moore Dep. at 278-79).  Moreover, Plaintiff has offered no evidence that Mr. Moore was even aware of the decision to terminate Plaintiff because of the tape recordings.  Accordingly, the general rule applied by the Sixth Circuit in *Sims* and *Smith* applies.  Therefore, even if the Court finds a genuine issue of material fact with respect to Plaintiff's claim that her failure to achieve the requirements of her PIP was pretextual, her admitted tape recording of customers and managers without their consent in violation of St. Jude's express policy is a legitimate, non-discriminatory, non-pretextual reason entitling Defendants to summary judgment on all of Plaintiff's claims regarding her termination.

Second, Plaintiff argues that the lapse of time between Defendants' knowledge of the recordings and her termination indicates pretext.  Suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence. *DeBoer v. Mushashi Auto Parts, Inc.*, 124 Fed. Appx. at 393–94.  Plaintiff contends that Defendants delayed far too long after learning of her

recordings to rely upon them as a basis to terminate her.  Jones initially disclosed during mediation on May 8, 2009, that she recorded conversations with St. Jude customers; and, that her recordings supported her claims of discrimination and retaliation as well as refuted many of Defendants' proffered reasons for their discriminatory and retaliatory conduct. (Pl.'s Memo. in Opp. Ex. 9).  The disclosure of the existence of these recordings was made seven months before Plaintiff was terminated.

Upon learning of the tape recordings, Defendants requested copies of any recordings in Plaintiff's possession through the discovery process.  Defendants received copies of the recordings on October 8, 2009.  Defendants then describe that an investigation was conducted regarding the tape recordings and the decision was made to terminate Plaintiff by early December 2009.  Therefore, it took Defendants approximately two months to act on the evidence of the recordings.  Plaintiff asserts that Defendants did not do anything, not even comment on the recordings until she was terminated.  Plaintiff, therefore argues that "Defendants' delay, when viewed in a light most favorable to Jones, evidences that Defendants did not consider Jones' recordings to have been so egregious it merited her termination."  (Pl.'s Memo. in Opp. at 98-99).

Defendants argue that this Court rejected a virtually identical argument in *Watkins v. Ford Motor Co.*, 2005 U.S. Dist. LEXIS 33140 (S.D. Ohio 2005) (Weber, J.).  In *Watkins*, the plaintiff sued Ford Motor Company alleging discrimination in failing to promote him.  *Id.* at *1.  In June of 2003, as part of the discovery process in the case, the plaintiff produced to Ford copies of certain Ford "employee profiles" that contained confidential information, including the employees' salary and performance data.  *Id.*  Ford took the plaintiff's deposition on December 10, 2003, at which time Plaintiff admitted that he had secretly copied the employee profiles from a binder in Ford's personnel

office and had then removed the copies from the plant.  *Id.*  Six months after the documents were produced, and 51 days after the plaintiff's deposition, a Ford manager recommended that the plaintiff be terminated for secretly copying and retaining Ford's confidential documents.  Ford did not actually terminate the plaintiff until April of 2004.  *Id.*  In arguing that this reason for his termination was pretextual, the plaintiff in *Watkins* argued that because Ford did not fire him in June of 2003 when it first learned that he had the documents, the decision to do so eight months later was pretextual. *Id.* at *9.  This Court, however, found that "the time lag carries no weight in light of defendant's unrefuted testimony that it had no way of knowing at that time how the documents had been obtained and it remained unaware of that information until it took plaintiff's deposition on December 10, 2003."  *Id.*  The Court further held that the 51 days "is not an unreasonable length of time for a large company to complete an investigation into serious employee misconduct and to determine the appropriate disciplinary action."  *Id.*  Therefore, the Court held that the length of time "to complete its investigation and to make the decision to discharge [the employee] does not cast doubt on the credibility of [the employer's] explanation."  *Id.*

The case at bar is factually similar to *Watkins*.  Plaintiff first indicated to St. Jude that she had tape recordings at mediation in May 2009, while in *Watkins*, Ford first obtained the documents in June.  St. Jude first obtained copies of the tapes in October, at which point it could analyze the recordings to determine whether there had been a violation of company policy, while in *Watkins*, Ford deposed the plaintiff about the documents in December.  Finally, within two months of learning of a violation of company policy, both St. Jude and Ford completed their investigations and concluded that the employees should be terminated.  As this Court stated in *Watkins*, this amount of time "is not an unreasonable length of time for a large company to complete an investigation into serious

employee misconduct and to determine the appropriate disciplinary action" and the length of time "to complete its investigation and to make the decision to discharge [the employee] does not cast doubt on the credibility of [the employer's] explanation." *Id.*

Finally, Plaintiff argues that she was forced to make the recordings in order to preserve evidence for her discrimination and retaliation claims. Again, this Court has already rejected a similar argument. As this Court held in *Watkins*, employees are not excused from the consequences of violating a company policy even if the employee breaks the rule to preserve evidence in litigation. 2005 U.S. Dist. LEXIS 33140. The court stated:

> The fact that plaintiff purportedly obtained the documents for use in a lawsuit does not excuse his conduct, particularly since plaintiff could have sought that information by securing counsel and going through the proper legal channels. A reasonable jury could not find plaintiff engaged in a legitimate means of preserving evidence by copying sensitive employee information maintained by his employer that had not been provided to him and removing the copies from defendant's property. Such conduct cannot be sanctioned as protected activity as a matter of law. Thus, a reasonable jury could not find that defendant violated Ohio's anti-retaliation law by firing plaintiff for that conduct.

*Id.*

In addition to *Watkins*, numerous courts, including the Sixth Circuit, have upheld the termination of employees for making or attempting to make tape recordings to preserve evidence. *Perkovich v. Roadway*, 1197 U.S. App. LEXIS 1155 (6th Cir. 1997) (Sixth Circuit affirming summary judgment where the employee was terminated for insubordination when she continued to try to bring a tape recorder to her performance review); *Moray v. Novartis*, 2009 U.S. Dist. LEXIS 1409 (M.D. Tenn. 2009) (district court granting summary judgment where the employer's code of conduct explicitly prohibited recording conversations without consent, and the employee admitted that she tape recorded a meeting during which she received a coaching plan because she felt the company

believed her supervisors' word over hers and did not take her complaint seriously); *San v. Scherer*, 1998 Ohio App. LEXIS 405 (Ohio App. 10th Dist. 1998) (Ohio court of appeals affirming decision to cut off damages based on after-acquired evidence that employee secretly tape recorded conversations, and stating, "[w]hether or not the tapings were illegal in Connecticut and/or Ohio is immaterial.  Mr. Pastorino stated that had he known of such tapings, he would have terminated Mr. Sans immediately.  Without evidence to refute this, there is no genuine issue of material fact.").

In this case, as in the above-cited cases, Plaintiff made tape recordings without consent in violation of an express company policy—all of which she admits.[8]  As in those cases, the fact that Plaintiff felt she had a good reason to make the recordings and was trying to preserve conversations does not show that her termination for violating the non-consensual recording policy was pretextual.  As in *Watkins*, Plaintiff's argument that she needed to make the tape recordings to preserve evidence is specious.  She could have used any number of other, permissible, methods to record evidence, including written statements, affidavits, or consensual tape recordings, which would not have violated St. Jude's policy.  As in *Watkins*, Plaintiff's desire to preserve evidence does not give her the right to violate St. Jude's policy with impunity, and does not turn her admitted violation of the policy into a pretext for discrimination.

Plaintiff argues that the tape recordings are subject to a Protective Order and have not left the confines of this litigation.  Plaintiff relies on *Lees v. Thermo Electron Corp.*, 2008 U.S. Dist. LEXIS 103330 (S.D. Ohio 2008) (Sargus, J.) (stating that the employee's damages in ADEA action were not capped because he made recordings of conversations where the recordings were subject to a

---

[8] Plaintiff admits that she specifically checked St. Jude's policy to find out whether secret tape recordings were prohibited, learned that they were prohibited, and then continued making them. (Pl. Dep. 128-43.)

protective order and had not left the confines of litigation).  However, unlike St. Jude, the employer in *Lees* had only a general policy requiring honesty and good faith, but it did not have an express policy prohibiting non-consensual tape recordings.  The court held that because it was not clear whether the tape recordings would violate the honesty and good faith policy, the issue of whether the tape recordings would rise to the level of a terminable offense was a question of fact for the jury. However, the *Lees* case is not applicable to the case at bar because St. Jude had an express policy that prohibited the secret tape recordings and Plaintiff does not dispute this policy, nor that it was a terminable offense.  Accordingly, Plaintiff cannot demonstrate pretext.

The Court concludes that Plaintiff has failed to produce sufficient evidence from which a jury could reasonably reject Defendants' explanation and infer that the Defendants terminated Plaintiff based upon her race and/or sex.  Accordingly, Defendants are entitled to judgement on this claim.

## B.    Plaintiff's Retaliation Claims

Plaintiff alleges that Defendants retaliated against her because she filed a charge of discrimination with the EEOC on June 27, 2008, and because she filed this lawsuit on November 6, 2008.  Plaintiff alleges that she can establish a *prima facie* case of retaliation with respect to each of the following: (1) giving her a "2" on her 2008 performance evaluation; (2) removing the Dr. Noble account from her territory; (3) placing her on a PIP and extending the PIP for 60 days; and (4) terminating her employment.  (Pl.'s Memo. in Opp. at 109-18).  Defendants maintain they are entitled to judgment in their favor on each of these alleged retaliation claims.  The Court agrees.

Title VII prohibits an employer from retaliating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Title VII and § 1981 retaliation claims are analyzed under a

66

variation of the burden-shifting framework set forth in *McDonnell Douglas*. *CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1960-61 (2008); *Johnson*, 215 F.3d at 573.  In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) the defendant knew of this exercise of his protected rights; (3) the defendant consequently took an action that was "materially adverse" to the plaintiff; and (4) there is a causal connection between the protected activity and the materially adverse action.  *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003); *see also Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action").  A plaintiff may satisfy the participation element of a *prima facie* case for retaliation by showing he reasonably believed his activity was protected.  *See Johnson,* 215 F.3d at 582.

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to come forward with a legitimate, non-discriminatory and non-retaliatory reason for the adverse action against the plaintiff.  *Hicks*, 509 U.S. at 506-507; *Burdine,* 450 U.S. at 252-53.  If the defendant comes forward with a legitimate, non-discriminatory and non-retaliatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination or retaliation.  *Hicks*, 509 U.S. at 512 n. 4; *Burdine,* 450 U.S. at 253.  "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens.  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." *Burdine* 450 U.S. at 253.

In the instant case, Defendants contend that Plaintiff fails to establish a *prima facie* case of

retaliation for each of her alleged claims and that even if she could establish a *prima facie* case, she cannot prove that the Defendants' reasons for their actions are pretext for retaliation.  The Court considers each alleged claim of retaliation in turn.

### 1.    2008 Performance Evaluation

Plaintiff claims that St. Jude retaliated against her for engaging in protected conduct when it gave her a "2" ("below expectations") on her 2008 performance evaluation.  Defendants argue that Plaintiff's claim fails because she cannot establish a *prima facie* case and because St. Jude has articulated a legitimate nondiscriminatory justification for its actions, which Plaintiff cannot show is pretext for retaliation.  Defendants maintain that Plaintiff cannot establish a *prima facie* case of retaliation with respect to the performance evaluation because she cannot show it was an adverse action, nor can she establish a causal connection between her protected activity and any subsequent employment action.

### a.    Adverse Action

As this Court has articulated, in the context of a retaliation claim, Plaintiff must show that a reasonable employee would have found the challenged action to be "materially adverse," which means that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Allen*, 697 F. Supp. 2d at 895.  The Sixth Circuit has held that a lowered performance evaluation is not an adverse employment action for purposes of a retaliation claim unless it "significantly impact[s] an employee's wages or professional advancement." *Halfacre v. Home Depot, U.S.A., Inc.*, 221 Fed. App'x 424, 433 (6th Cir. 2007).  Further, evaluations and PIPs do not constitute materially adverse actions within the context of Title VII. *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006).

Here, there is no dispute that Plaintiff's 2008 performance review had no effect on her wages or salary. Mr. Ellen, the Regional Sales Manager who conducted Plaintiff's 2008 performance evaluation testified that whether a Sales Rep's evaluation is good or bad, "it doesn't affect them either way . . . ." (Ellen Dep. at 213). The evaluation is merely placed into the Rep's file. (Ellen Dep. at 213). Earlier, the Court found that the evaluations and PIPs did not constitute adverse employment actions for purposes of Plaintiff's disparate treatment claims. (*See* Section III.A.1.(b)). For many of the same reasons articulated in support of that finding, the Court finds that the evaluations and PIPs are not materially adverse, even under the less stringent *Burlington Northern* standard for retaliation claims. Accordingly, with respect to the receipt of a "2" on her 2008 performance evaluation, Plaintiff cannot establish the second prong of her *prima case*—that she suffered an adverse employment action.

### b. Causal Connection

To establish the element of causation in a retaliation claim, a plaintiff "is required to proffer evidence sufficient to raise the inference that his protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corporation*, 104 F.3d 858, 861 (6th Cir. 1997). "[A]t the *prima facie* stage, the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from the evidence, providing it is credible." *Id*. "Although no one factor is dispositive in establishing a causal connection . . . evidence that defendant treated the plaintiff differently than similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000).

In the context of Plaintiff's discrimination claim, the Court held that Plaintiff was not treated differently from similarly situated employees. Plaintiff was given a "2" because her sales performance was low, with the lowest sales in Columbus. Lou Major sold in excess of $1 million, Paul Giacobbe sold in excess of $2.6 million; and Doug Woyton sold in excess of $5.4 million.

Therefore, with respect to Plaintiff's retaliation claim, she cannot establish a causal connection because she cannot show that she was treated less favorably than similarly situated employees who did not engage in protected conduct. In addition, Plaintiff cannot establish a causal connection because at least 5 months elapsed between Plaintiff's last instance of protected conduct and the issuance of her 2008 performance evaluation. As the Sixth Circuit has held, "a five-month gap in time does not by itself suffice to get to a jury on causation." *Lahar v. Oakland County*, 304 Fed. App'x 354, 359 (6th Cir. 2008) (citing *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272-73 (6th Cir. 1986)).

### c.    Pretext

Even if Plaintiff could make out a *prima facie* case, St. Jude has articulated a legitimate nondiscriminatory reason for giving Plaintiff a performance evaluation of "2," which Plaintiff cannot establish is pretext for discrimination. Plaintiff's sales performance was low. Even considering Plaintiff's own sales calculations, her sales were still the lowest in the Columbus region. Based on this evidence, Plaintiff cannot show that Defendants' determination that Plaintiff's sales performance was "below expectations" was false and that retaliation really motivated Plaintiff's performance score of "2." Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims regarding the performance evaluation.

### 2.    Removing Dr. Noble's Account from Plaintiff's Territory

Plaintiff claims that St. Jude retaliated against her for engaging in protected conduct by removing Dr. Charles Noble from her sales territory. Defendants argue that Plaintiff cannot establish a *prima facie* case, and even if she could, that they have articulated a legitimate nondiscriminatory justification for its actions, which Plaintiff cannot show is pretext.

### a. Causal Connection

Defendants argue that Plaintiff cannot show a causal connection between her protected activity and the removal of the Dr. Noble account because she fails to show that similarly situated employees who did not engage in protected conduct were treated more favorably with respect to the Dr. Noble account, and because at least seven months elapsed between Plaintiff's last instance of protected conduct and the removal of the Noble account.

As discussed in detail regarding Plaintiff's discrimination claim, Defendants also removed the Dr. Noble account from Woyton and McQuarrie, both two Caucasian males. In fact, St. Jude took the Noble account away from Woyton and McQuarrie in order to give the Nobel account to Plaintiff, and then St. Jude gave the Noble account to Major, who also made allegations of discrimination–thus, the account was not given to someone who had not complained of discrimination. (Major Dep. at 174-75; Major Dep. Ex 4).

Plaintiff initiated this lawsuit in November of 2008. However, St. Jude did not remove the Noble account until June of 2009 – seven months later. Accordingly, Plaintiff cannot establish a causal connection based on temporal proximity. *Lahar*, 304 Fed. App'x at 359 (finding that a five-month gap between protected conduct and alleged retaliation could not sustain a causation inference, absent other evidence of retaliation).

### b. Pretext

Even if Plaintiff could establish a *prima facie* case for retaliation in the removal of the Dr. Noble account from her territory, Defendants argues that they have articulated a legitimate, nondiscriminatory reason for the removal and the transfer to Major. Specifically, St. Jude removed Dr. Noble from Plaintiff's account because Plaintiff was not making traction in the account, and St. Jude thought Major could increase sales due to his prior relationship with Dr. Noble. As discussed above with respect to the disparate treatment claim, Plaintiff has no evidence that this reason is a pretext for retaliating against her, especially because the account was given to Major who has also engaged in protected activity. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims regarding the Dr. Noble account.

### 3. Placing Plaintiff on a PIP and her Termination

Plaintiff claims that St. Jude retaliated against her for engaging in protected conduct when it placed her on a PIP and ultimately terminated her employment. Defendants argue that Plaintiff cannot establish a *prima facie* case because there was no causal connection between her protected activity and being placed on the PIP, and ultimately terminated. Defendants argue that even if Plaintiff can set forth a *prima facie* case, they have and articulated a legitimate nondiscriminatory justification for its actions, which Plaintiff cannot show is pretext.

### a. Adverse Employment Action

Plaintiff must show that being placed on a PIP constitutes an adverse employment action. However, this Court has recently held, in the context of a retaliation case, that a PIP is not a materially adverse employment action. *Allen*, 697 F. Supp. 2d at 894-895 ("Defendants maintain that Allen cannot establish a *prima facie* case of retaliation with respect to the poor evaluations and the PIPs because such actions are not materially adverse. . . . The Court agrees with Defendants that the

poor evaluations and PIPs do not constitute materially adverse actions within the context of Title VII [retaliation] . . . ."). This Court expressly stated in the *Allen* case that, "in reaching the conclusion that the evaluations and PIPs do not constitute materially adverse actions within the context of Title VII, [the Court] considered the standards set forth by the U.S. Supreme Court in *Burlington Northern* and *Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L. Ed. 2d 345 (2006)." *Id.*

In the case at bar, as in *Allen*, Plaintiff's PIP was not an adverse employment action. For the same reason that being placed on a PIP was not an adverse employment action, St. Jude's decision to extend Plaintiff's PIP when she initially failed to meet its requirements was also not an adverse employment action. Accordingly, Plaintiff cannot establish the second prong of her *prima case*—that she suffered an adverse employment action.

However, with respect to Plaintiff's termination, there is no dispute that it constitutes a materially adverse employment action.

### b.    Causal Connection

As stated above, while no one factor is dispositive in establishing a causal connection between the alleged protected conduct and the alleged adverse employment action, courts look to evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights in order to establish causation. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999). Here, Plaintiff cannot show that she was treated less favorably than similarly situated employees who did not engage in protected conduct. Plaintiff was selected to be part of St. Jude's nationwide RIF due to her low sales performance and the fact her territory generated substandard revenue (less than a million dollars) and

was not growing. (Moore Dep. at 265-66). Plaintiff was under a term of years agreement, therefore, she was offered either a severance package or to be placed on a PIP. Plaintiff selected the PIP. However, Plaintiff cannot identify any other comparable Sales Representative outside of her protected class who had sales as low as hers and who was not selected for the RIF and, consequentially, placed on a PIP.

In addition, Plaintiff cannot establish a causal connection between her protected activity and her PIP based on temporary proximity, as mere temporal proximity is *ordinarily* insufficient, by itself, to raise an inference of a causal connection between the protected activity and the retaliatory act.[9] *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). Plaintiff filed this lawsuit in November of 2008. She was not placed on her PIP until August 2009–nine months after the protected activity. Where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007); *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) *cert. denied*, 128 S.Ct. 366 (2007); *Randolph v. Ohi Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (noting that "[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation"). Such additional evidence might include treatment

---

[9] However, under certain circumstances, closeness in time can suffice to satisfy a *prima facie* case of retaliation. *See e.g.*, *Mickey v. Zeidler Tool & Die Company,* 516 F.3d 516 (6th Cir. 2008); *see also, Smith v. City of Salem*, 378 F.3d 566, 571 (6th Cir. 2004) (4-6 day interval without more was sufficient to satisfy plaintiff's case of retaliation)*; Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (same day); *DeCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (13-day interval); *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (two-month interval); *Sinfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three-month interval). Three months seems to be the outside limit.

different from that given to similarly situated employees who did not engage in protected activity or increased scrutiny after the plaintiff complained.  *See e.g.*, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007), *cert. denied*, 128 S.Ct. 1657 (2008); and *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (finding that lapses of from two to five months between the plaintiff's EEOC charge and various disciplinary actions were insufficient to raise a *prima facie* retaliation claim).

Under the circumstances of this case, this lapse of time is simply too great to establish a causal connection.  *Lahar v. Oakland County*, 304 Fed. App'x 354, 359 (6th Cir. 2008) (finding that a five-month gap between protected conduct and alleged retaliation could not sustain a causation inference, absent other evidence of retaliation, and citing *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272-73 (6th Cir. 1986) (holding that a four-month gap is insufficient)). Accordingly, Plaintiff's *prima facie* case of retaliation with respect to her PIP fails.

Further, Plaintiff  cannot make out a *prima facie* with respect to her termination for the reasons set forth above regarding Plaintiff's discrimination claim.  Specifically, there were no individuals outside of Plaintiff's protected class who were placed on a PIP as part of the nationwide RIF, failed to meet the requirements of the PIP, and were not terminated. Indeed, the only other person outside of Plaintiff's protected class who failed to meet the requirements of a PIP was also terminated. In addition, there were no employees outside of Plaintiff's protected class who violated St. Jude's tape recording policy and who were not terminated.  (Grubiak Dec. ¶ 17).  In addition, because more than a year elapsed between the time when Plaintiff filed this lawsuit in November of 2008 and her termination in December of 2009, Plaintiff cannot show causation on the basis of temporal proximity.  *Lahar*, 304 Fed. App'x at 359.  Accordingly, Plaintiff's *prima facie* case for

retaliation fails.

### c. Pretext

Even if Plaintiff could make out a *prima facie* case, Defendants argue that they have articulated legitimate, nondiscriminatory reasons for placing Plaintiff on a PIP and for extending her PIP, which Plaintiff cannot establish were pretexts for retaliation. Further, Defendants have articulated legitimate, non-discriminatory reasons for terminating Plaintiff.

St. Jude was conducting a nationwide RIF and each region was to include three individuals for the RIF. Plaintiff was selected for the RIF in the Columbus region due to low sales. Plaintiff cannot dispute that she had the lowest sales performance among the Columbus Sales Representatives. Plaintiff chose to be placed on a PIP when given the option between a severance package or being placed on a PIP. St. Jude extended Plaintiff's PIP, even though she was not meeting its terms, but because she had shown improvement in September. Plaintiff cannot show that these reasons for St. Jude's actions were not its true motivations, and that they were pretexts for retaliation. In fact, St. Jude selected two other employees for the RIF in the Columbus region (Hal Ellen and Andrew Fitzpatrick) who had not engaged in protected conduct. In addition, the other employees nationwide who were placed on the PIP (instead of accepting a severance) also had not engaged in protected activity. Accordingly, Defendants are entitled to summary judgment.

Next, Defendants assert that their legitimate, non-discriminatory reasons for terminating Plaintiff were that she failed to meet the requirements of her PIP and violated St. Jude's tape recording policy. Plaintiff cannot establish that these reasons were pretexts for discrimination, for the reasons stated above in the discussion on Plaintiff's discrimination claim. Specifically, Plaintiff admits that she failed to meet her PIP requirements and admits that she knowingly violated the tape

recording policy. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims regarding her termination.

In conclusion, Plaintiff cannot demonstrate a *prima facie* case of retaliation because she has failed to proffer evidence sufficient to raise the inference that her protected activity was the likely cause of the adverse actions. Consequently, Defendants are entitled to summary judgment on these claims.

## C. Hostile Work Environment

Plaintiff alleges that she was subject to a hostile work environment and a retaliatory hostile work environment on the basis of race and sex. Plaintiff alleges the following incidents that she claims contributed to the hostile work environment:

1. pay cut and lowest pay guarantee

2. Major's demotion and the hockey puck incident

3. Removing Riverside from her territory

4. Failing to timely investigate Plaintiff's complaints

5. Failing to provide Plaintiff assistance

6. Unwarranted badgering

7. Removing Dr. Noble from her territory

8. 2008 Performance Review

9. Plaintiff's PIP and Termination

(Pl.'s Memo. in Opp. at 128-134). Defendants seek judgment in their favor on Plaintiff's hostile work environment claims.

"Hostile work environment claims based on racial harassment are reviewed under the same

77

standard as those based on sexual harassment." *National R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 116 n. (2002), citing *Faragher v. Boca Raton*, 524 U.S. 775, 786-787, and n. 1 (1998); *Meritor*

*Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).  A plaintiff establishes a *prima facie* case

of a racially hostile work environment by demonstrating that "(1) the plaintiff was a member of a

protected class; (2) the plaintiff was subjected to unwelcome racial harassment; (3) the harassment

was based on race; (4) the harassment unreasonably interfered with the plaintiff's work performance

by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable."

*Armstrong v. Whirlpool Corp.*, 2010 WL 273691, *6 (6th Cir. 2010) *(citing *Barrett v. Whirlpool Co.*,

556 F.3d 502, 515 (6th Cir. 2009)).

     A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 21 (1993) (internal quotations and citations omitted); *Jackson v. Quanex*, 191 F.3d 647, 658

(6th Cir. 1999).  Both an objective and a subjective test must be applied: the conduct must have been

severe or pervasive enough to create an environment that a reasonable person would find hostile or

abusive, and the victim must subjectively regard that environment as having been abusive. *Harris*, 510

U.S. at 21-22.  Isolated incidents, unless extremely serious, will not amount to discriminatory changes

in the terms or conditions of employment.  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784,

790 (6th Cir. 2000).  Appropriate factors for the court to consider when determining whether conduct

is severe or pervasive enough to constitute a hostile work environment include:

    1.    the frequency of the discriminatory conduct;

    2.    the severity of the discriminatory conduct;

3.    whether the discriminatory conduct is physically threatening or humiliating, or a mere offensive utterance;

4.    whether the discriminatory conduct interferes with an employee's work performance; and

5.    whether the plaintiff actually found the environment abusive.

*Harris*, 510 U.S. at 21-22; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (reciting factors from *Harris*).  "[T]he inquiry is not subject to any precise mathematical test."

*Armstrong*, 2010 WL 273691 at *6, citing *Abeita v. Transamerica*, 159 F.3d 246, 251 (6th Cir.1998).

The Supreme Court has explained:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Id.*, at 80.  Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . ." B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992) (hereinafter Lindeman & Kadue) (footnotes omitted). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. *See, e.g., Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-750 (C.A.8 1986); *See also* 1 Lindemann & Grossman 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

**1.    Hostile Working Environment**

Defendants do not dispute that Plaintiff is a member of a protected class, however, Defendants argue that Plaintiff cannot satisfy the remaining elements of a hostile work environment claim.  The Court agrees that Plaintiff cannot establish that a hostile work environment existed.  "Plaintiffs must overcome a high threshold to demonstrate actionable harm, for 'complaints attacking the ordinary tribulations of the workplace, such as the sporadic

use of abusive language, gender-related jokes, and occasional teasing' are insufficient to obtain relief

under Title VII." *Baugham v. Battered Women, Inc*., 211 Fed. App'x 432, 438 (6th Cir. 2006) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). It is only "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' [that] Title VII is violated." *Harris v. Forklift Sys*., 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

In making this determination, courts considers such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

The Sixth Circuit has instructed that "[t]he harassment should be ongoing, rather than a set of isolated or sporadic incidents." *Clark v. UPS*, 400 F.3d 341, 351 (6th Cir. 2005). In addition, "[t]he plaintiff must show that the working environment was both objectively and subjectively hostile." *Id.* "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Harris*, 510 U.S. at 21. "Title VII was not meant to create a 'general civility code,' and the 'sporadic use of abusive language, gender-related jokes, and occasional teasing' are not sufficient to establish liability." *Clark*, 400 F.3d at 352. "'Mere utterance of an . . . epithet which engenders offensive feelings in an employee,' does not sufficiently affect conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (quoting *Meritor Savings*

80

*Bank*, 477 U.S. at 67).

The Sixth Circuit has held that racial slurs and conduct far more offensive than anything alleged by Plaintiff still falls short of that necessary to create an actionable hostile work environment. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000). The Sixth Circuit has also found in several cases that isolated and sporadic sexual jokes, even coupled with an act of battery or physical touching, did not amount to conduct severe or pervasive enough for the plaintiff's sexual harassment claim to survive summary judgment. *See e.g., Gwen v. Reg'l Transit Auth.*, 7 Fed Appx. 496, 502 (6th Cir. 2001); *Burnett v. Tyco*, 203 F.3d 980, 982 (6th Cir. 2000); *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000); *Stacy v. Shoney's, Inc.*, No. 97-5393, 1998 U.S. App. LEXIS 6659, at *1-3 (6th Cir. 1998).

In *Smith*, an African-American plaintiff alleged that a Caucasian supervisor had distributed a cartoon depicting an African-American man with a rope around his neck and penis while standing in front of a Caucasian woman. *Id.* at 757. The cartoon was captioned, "How a Black Man Commits Suicide." *Id.* The plaintiff alleged that another Caucasian supervisor had told a "nigger" joke and that a foreman referred to a black employee as "gorilla." *Id.* Despite the exceedingly offensive nature of these acts, the Sixth Circuit held that they were "simply not 'severe or pervasive enough' to create an objectively hostile work environment." *Id.* at 760.

Here, the undisputed evidence shows that only one comment was made, referring to Mr. Major as a hockey puck. During a dinner hosted by Supper, the new RSD for Columbus, Suppes asked each Sales Representative to tell a story about himself or herself that people would find amusing or would not expect of them. Major, who is African American, stated that people might be surprised to learn that he was a pretty good ice hockey player. According to Major, Suppes then

81

said, "oh, were you the puck?" (Major Dep. 209-210). Under the Sixth Circuit cases cited above, this one comment, while insensitive, is insufficient to constitute an actionable hostile work environment as a matter of law. In *Smith*, *Gwen*, *Burnett*, and *Bowman*, the Sixth Circuit found much more egregious conduct to be insufficient to constitute a hostile work environment. Accordingly, Plaintiff's claim fails and Defendants are entitled to summary judgment.

In addition, Plaintiff's sexual harassment claim fails because she cannot identify any harassment that was based on her sex. The only incident of "harassment" Plaintiff has identified is the "hockey puck" comment said by Mr. Suppes about Mr. Major. (Jones Dep. at 267-269). Plaintiff admitted that she did not observe any conduct or comments that she believed to be sexist at all. (Jones Dep. at 268). Accordingly, Defendants are entitled to summary judgment on Plaintiff's sexual harassment claims.

Further, Defendants cannot be liable because they took reasonable care to prevent and promptly correct any harassment. A defendant is not vicariously liable for a hostile work environment where it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and where the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Balding-Margolis v. Cleveland Arcade*, 352 Fed. Appx. 35, 44 (6th Cir. 2009). "Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced a sexual harassment policy." *Id.*

In the case at bar, St. Jude promulgated a harassment policy in its Employee Handbook, which states that all forms of harassment, including racial and sexual harassment are prohibited. The policy instructs any employee who believes he or she has been the victim of or has witnessed harassment to report it to their Human Resources manager or to St. Jude's Business Integrity Help Center on the

St. Jude website. (Moore Dec. ¶ 43-44; Ex. B). In addition, St. Jude managers undergo harassment training. (Moore Dep. at 27-28). Accordingly, St. Jude has taken "reasonable care to prevent and correct" harassment. Despite this policy, Plaintiff did not report the hockey puck comment to HR. Rather, St. Jude first learned about the hockey puck comment when Plaintiff's attorney in this case, Ms. Galeano, mentioned it to St. Jude's in-house counsel in a letter dated May 7, 2008 (four months after the incident). (Jones Dep. at 123-124). After the comment was brought to St. Jude's attention via Ms. Galeano's letter, St. Jude's HR department investigated the claim that Mr. Suppes had made the "hockey puck" comment, and found it to be substantiated. (Lepore Dep. at 213-214). In response to St. Jude's investigation, Mr. Suppes offered his resignation in June of 2008, which Mr. Moore accepted. (Suppes Dep. at 133; Moore Dep. at 110). Mr. Suppes's employment with St. Jude ended on June 27, 2008. (Suppes Dep. at 241). Plaintiff testified that, other than the "hockey puck" comment, she did not hear any comments or see any behavior that was racist or sexist. (Jones Dep. at 267-69).

Plaintiff argues that the following ongoing circumstances, when considered in their totality, demonstrate a severe and pervasive hostile work environment based on race and sex: a pay cut and the lowest pay guarantee; Major's demotion and the hockey puck incident; removing Riverside from her territory; failing to timely investigate Plaintiff's complaints; failing to provide Plaintiff assistance; unwarranted badgering; removing Dr. Noble from her territory; her 2008 Performance Review; Plaintiff's PIP and Termination. However, aside from the hockey puck incident discussed above, Plaintiff does not provide any evidence that any of these circumstances are a result of a her race or sex. While Plaintiff is correct in arguing that actions that are not overtly racist or sexual in nature can sometimes create a hostile work environment, those actions must still have been taken because of race

83

or sex to constitute actionable harassment.  Where the complained-of behavior is not overtly or explicitly racial or sexual, the plaintiff must present sufficient evidence to create an inference that but for the plaintiff's race or sex, the behavior would not have been undertaken.  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463-64 (6th Cir. 2000); *Williams v. General Motors Corp.*, 187 F.3d 553, 565-66 (6th Cir. 1999).  Plaintiff has failed to show that any of the aforementioned actions would not have been taken but for her race or sex and therefore Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim.

### 2.    Retaliatory Hostile Work Environment

Plaintiff argues that summary judgment is not warranted on this claim because Defendants have failed to address or seek judgment on her claim of retaliatory hostile work environment. Defendants, however, argue that Plaintiff did not plead a retaliatory harassment claim and therefore this claim is not properly before the Court.  The Court agrees.  The hostile work environment claims only reference race, color, and gender.  And Plaintiff's counts alleging retaliation do not allege a hostile work environment.

Even if this claim were properly before the Court, Defendants would be entitled to summary judgment on it for the same reasons that Defendants are entitled to summary judgment on Plaintiff's racial and sexual harassment claims.  Plaintiff cannot prove that any of the actions that allegedly made up the hostile work environment were based on her protected activity.  She cannot establish that she was exposed to disadvantageous terms or conditions of employment to which employees who did not engage in protected activity were not exposed.  *See Bowman*, 220 F.3d at 463-64; *Williams*, 187 F.3d at 565.

### D.    Federal and State Equal Pay Act Claims

Plaintiff alleges violations of both the Federal Equal Pay Act and the Ohio equal pay statute. The statutes are virtually identical; however, the federal EPA only applies to wage discrimination on the basis of sex, whereas Ohio Revised Code § 4117.17 also prohibits wage discrimination on the basis of race. Regardless, courts apply federal EPA standards to resolve Ohio Revised Code § 4117.17 claims. *See Creech v. The Ohio Casualty Ins. Co*, 944 F. Supp. 1347, 1353 (S.D. Ohio 1996); *Stone v. Greater Cleveland Regional Transit Auth.*, 635 N.E.2d 1281, 1288 (Ct. App. Ohio 1993).

The Equal Pay Act provides that men and women performing "equal work" in the "same establishment" must receive "equal pay" unless the employer can justify a pay differential by pointing to a justification other than sex (or race under Ohio law). 29 U.S.C. § 206(d)(1). A plaintiff alleging a violation of the federal and state equal pay statutes must make a *prima facie* showing that (1) the employer paid different wages to male and female employees (2) for substantially equal work. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 987 (6th Cir. 1992).

Only if the plaintiff establishes a *prima facie* case of wage discrimination, must the defendant show that the pay difference is justified by one of the four affirmative defenses enumerated in 29 U.S.C. § 206(d)(1). *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005). Those defenses provide that an employer still prevails on an unequal pay claim if it shows that a pay differential "is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex" (or race under Ohio law). 29 U.S.C. § 206(d)(1). When an employer justifies any pay differential under one of the affirmative defenses, that employer cannot be held liable under the equal pay statutes. *Id.*

The EPA and the Sixth Circuit have made it clear that when comparing the compensation of male and female employees, the focus must be on their respective rates of pay, rather than their total compensation. 29 U.S.C. § 206(d)(1); *Bence v. Detroit Health Corp*., 712 F.2d 1024 (6th Cir. 1983). The statute itself provides that employers shall not discriminate between employees by paying wages "at a rate less than the rate" at which the employer pays employees outside the protected class. 29 U.S.C. § 206(d)(1). In *Bence*, the Sixth Circuit made it clear that in the case of commissioned sales people, it is the commission rate, not the total commissions paid, that is dispositive. 712 F.2d 1024, 1027-28. In that case, the employer operated health spas, and employed both male and female managers. *Id.* at 1025-26. The male managers sold spa memberships to men, and the female managers sold memberships to women. *Id.* at 1026. The employer paid men a higher commission rate on sales than it paid to women. *Id.* Specifically, it paid men commission at the rate of 7.5% and it paid women commission at the rate of 5%. The employer did this because more women than men bought spa memberships, so the female managers had a higher sales volume. *Id.* The goal of using different rates was so that members of each sex would have an equal amount of total commission earnings. *Id.* The employer contended that it did not violate the EPA because, while the commission rates were different, the total compensation was substantially equal. *Id.* The Sixth Circuit expressly rejected the employer's argument in *Bence*, finding that it was the rate of commissions that was dispositive, not the total compensation. *Id.* at 1028. The Court explained, "[e]valuation of employer's compensation on a 'per sale' basis makes it apparent that it paid female managerial personnel at a lower rate than their male counterparts. This is precisely what the Equal Pay Act forbids." *Id.*

Defendants do not dispute that Plaintiff and the other sales representatives in the Columbus

region were engaged in equal work.  However, Defendants argue that Plaintiff cannot maintain a *prima facie* case for violation of the Equal Pay Act because she cannot show that St. Jude paid her lower wages than the Caucasian sales representatives.  Plaintiff's compensation as a commissioned Sales Representative included a base salary plus commissions on her sales.  The undisputed evidence demonstrates that the rate of Plaintiff's base salary and commissions were equal to or greater than her Caucasian male colleagues' rates.  Plaintiff's base salary was paid at a rate of $60,000 per year.  (Jones Dep. at 72, Ex. 4).  The only other Columbus Sales Representative who had a base salary as high as Plaintiff's was Lou Major (an African American male), whose base salary was also $60,000.  (Moore Dep. at 133, 145, 151, 169, 179, Exs. 6-8, 14, 16).  All of the other Columbus Sales Representatives (who were Caucasian males) had base salaries that were paid at a rate of $50,000 per year. *Id.*  Accordingly, Plaintiff's base salary rate was the highest in the Columbus region.

Plaintiff also earned commissions at a rate that was as high or higher than her Caucasian male counterparts.  In her assigned Territory A, which she shared with Paul Giacobbe (a Caucasian male), both Plaintiff and Mr. Giacobbe received commissions on all sales made in the account, regardless of who made the sale. (Jones Dep. at 80-81).  However, Plaintiff received a higher commission rate than Mr. Giacobbe on every sale in the account. *Id.*  Specifically, for every LV sale made in the Riverside account, Plaintiff was paid commissions at a rate of 7.75%, while Mr. Giacobbe was paid commissions at a rate of 4%. (Jones Dep. at 72, Ex. 4; Moore Dep. at 151, Ex. 8).  For HV devices, Plaintiff was paid commissions at a rate of 4.75%, while Mr. Giacobbe was paid commissions at a rate of 2%. *Id.*  In her assigned Territory B, in which she was the sole representative in each account, Plaintiff received commissions at a rate of 11.75% on LV devices and 6.75% on HV devices, representing full available commissions in those accounts. (Jones Dep. at 72, Ex. 4).  No other Sales

Representative in the Columbus region received higher commission rates in any account.  (Moore Dep. at 133, 145, 151, 169, 179, Exs. 6-8, 14, 16).  Accordingly, based on these undisputed facts, Plaintiff cannot show that St. Jude paid base salaries or commissions to her at a lower rate than to her Caucasian male colleagues, and her *prima facie* case fails with respect to those aspects of her compensation.

Plaintiff also received a minimum compensation guarantee for the first year of her employment in the Columbus region.  (Jones Dep. at 72, Ex. 4).  Defendants argue, and the Court agrees that Plaintiff's compensation guarantee was more favorable than almost every other Sales Representative and any differences in the guarantees of other Sales Representatives was based on factors other than race and sex.

A compensation guarantee is a promise by the employer to provide total compensation to a Sales Representative regardless of the amount of actual commissions earned in a period of time.  Plaintiff's contract included a "minimum compensation guarantee" for her first year of employment following her voluntary transfer to Columbus.  Specifically, Plaintiff's contract states: "For the first year of this Agreement (the 'Total Guarantee Period'), Employee [Plaintiff] will receive the greater of the actual compensation (i.e., salary plus commissions) to which Employee would be entitled, or the sum of $210,000.00, whichever is greater, prorated on a monthly basis." (Jones Dep. at 72, Ex. 4).  This equates to a monthly minimum compensation guarantee of $17,500.00.  At Plaintiff's request, St. Jude extended her guarantee for an additional two months, providing her with supplemental guaranteed income of $35,000 above and beyond its contractual requirement.  (Jones Dep. at 172).  Plaintiff's guarantee was merely a floor and there was no cap or ceiling on her earnings.

Unlike most Sales Representatives, Plaintiff's guarantee was paid with no negative repercussions, meaning that if she failed to sell enough implant devices to "justify" her compensation guarantee (i.e., to earn commissions in excess of the guarantee), she was not required to pay back the extra money received at the end of the guarantee period.  (Jones Dep. at 72, Ex. 4, pp. 10-11) ("[I]f at the end of the Total Guarantee Period Employee's earned commissions are short of the guarantee (i.e., a negative balance), St. JudeSC will forgive the negative balance.").  All of the other Columbus Sales Representatives except two (Erich Stohr and Lewis Antol) had so-called "guarantees" that actually required them to pay back any funds advanced to the extent that the Sales Representative's actual commission-based earnings were less than the "guarantee."  (Moore Dep. at 133, 145, 151, 169, 179, Exs. 6-8, 14, 16).  These "guarantees" therefore did not provide for minimum compensation in the same way as Plaintiff's guarantee.  Accordingly, Plaintiff's guarantee—which was a true guaranteed minimum compensation that did not have to be paid back—was more favorable than the so-called "guarantees" of the Sales Representatives who had to pay back any unearned amounts.  Those negative payback guarantees are simply not comparable to Plaintiff's true guarantee.  With respect to those Representatives, Plaintiff cannot make out a *prime facie* case of wage discrimination.

The only Sales Representatives who had true compensation guarantees that were higher than Plaintiff's guarantee were Erich Stohr (a competitive hire who began employment with St. Jude in May of 2008), and Lewis Antol (a competitive hire who began employment with St. Jude in November of 2009).  However, St. Jude is entitled to summary judgment regarding any unequal pay claims regarding Plaintiff's one-year compensation guarantee because any differentials between her

guarantee and those of Mr. Stohr and Mr. Antol are based on factors other than race and sex.

As stated above, an employer will defeat an unequal pay claim and prevail on summary judgment if it establishes that any pay differential is due to one of the enumerated defenses, i.e.: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex (or race). 29 U.S.C. § 206(d)(1); Ohio Rev. Code § 4111.17. The law is clear that a salary differential is justified under these defenses where it is necessary to meet market conditions and hire away a well-qualified candidate from a competitor. *Brune v. BASF Corp.*, 41 F. Supp. 2d 768, 778 (S.D. Ohio 1999) (aff'd in part, and rev'd in part on other grounds, 234 F.3d 1267 (6th Cir. 2000) (citing *Smallwood v. Jefferson Cty, Ky.*, 1996 U.S. App. LEXIS 24221, at *8 (6th Cir. 1996)).

In this case, Mr. Stohr's and Mr. Antol's compensation guarantees were based on factors other than their race and sex. Specifically, their guarantees were higher than Plaintiff's because they were competitive hires, not internal transfer candidates. (Moore Dec. ¶ 45-46). Plaintiff transferred internally to Columbus from a position with St. Jude in Jacksonville because of personal reasons. Plaintiff had no connections with any doctors or hospitals in Columbus, and no portable book of business. (Jones Dep. at 57). By contrast, both Mr. Stohr and Mr. Antol were competitive hires from Medtronic. Both did a substantial volume of business for Medtronic in the Columbus region, and the expectation was that much of that business would transfer to St. Jude because of the customers' loyalty to those sales representatives. (Moore Dec. ¶ 46-47). Mr. Stohr and Mr. Antol were offered higher compensation guarantees that were intended to incentivize them to switch to St. Jude, and to compensate them for the book of business they were expected to bring with them to St. Jude and for the net gain to St. Jude. These two competitive representatives both also had more

90

years of experience in the CRM industry than Plaintiff. (Moore Dec. ¶ 48). Accordingly, any differential between the compensation guarantees of Plaintiff and Mr. Stohr and Mr. Antol is based on factors other than race and sex. Therefore, Defendants are entitled to summary judgment on Plaintiff's wage discrimination claim.

## IV.  CONCLUSION

For all of the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment on all of Plaintiff's claims.

The Clerk shall remove Document 61 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

 */s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**